54 F.3d 764
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
 George C. WILLIAMS, et al., Plaintiffs, Appellants,
v.
Richard E. POULOS, et al., Defendants, Appellees.
George C. Williams, et al. Plaintiffs, Appellees,
v.
Richard E. Poulos, et al., Defendants, Appellants.
 Nos. 94-2057, 94-2058.
 United States Court of Appeals,
First Circuit.
 May 12, 1995.
 
 Allen S. Rugg, with whom Alan D. Strasser, Kutak Rock, John S. Whitman, and Richardson & Troubh, were on brief for appellants.
 Terry A. Fralich, with whom Peter J. DeTroy, and Norman, Hanson & DeTroy, were on brief for appellees.
 D.Me.
 AFFIRMED IN PART AND MODIFIED IN PART.
 Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.
 STAHL, Circuit Judge.
 
 
 1
 After appellants obtained substantial relief in their lawsuit alleging illegal wiretapping in violation of 18 U.S.C. Sec. 2511(1) and Me. Rev. Stat. Ann. tit. 15 Sec. 710(1), the district court, pursuant to the statutory schemes, ordered appellees to pay appellants' attorney fees and expenses in the amount of $283,950.58. Appellants now argue that the district court abused its discretion in awarding as little as it did; appellees maintain in their cross-appeal that the abuse of discretion occurred in awarding appellants anything at all. After careful review of the record, we conclude that the district court's basic approach is sound but that on certain matters it failed to provide a sufficient basis to justify certain of its deductions and made computational errors; thus we modify the district court order accordingly.
 
 I.
 BACKGROUND
 
 2
 We have previously recited in detail the factual background to the underlying, substantive lawsuit, Williams v. Poulos, 11 F.3d 271 (1st Cir. 1993) (the "Williams" lawsuit), and we therefore provide only a brief summary here. Appellants (plaintiffs in the Williams lawsuit) were defendants in a RICO lawsuit stemming from the demise of Consolidated Auto Recyclers, Inc. ("CAR"), Bowers v. Allied Capital Corp., Civ. No. 91-0021-B (D. Me. filed January 1991) (Brody, J.) (the "Bowers" lawsuit). In the course of discovery in the Bowers litigation, appellants learned from Richard Poulos, counsel for CAR's principals (the Bowers plaintiffs) that he had secret tapes of some of their conversations. After further discovery, appellants initiated the Williams lawsuit, seeking, inter alia, declaratory and injunctive relief, under federal and Maine wiretap laws, forbidding Poulos and the Bowers plaintiffs from using the tapes in the Bowers lawsuit. On February 3, 1993, following a six-day bench trial, the district court granted in large part appellants' requested relief, and we affirmed. Williams, 11 F.3d at 274.
 
 
 3
 Appellants then filed an application for attorney fees with the district court, pursuant to the federal and Maine wiretap statutes, both of which provide for the recovery of reasonable attorney fees and costs from defendants in successful civil actions. 18 U.S.C. Sec. 2520(a)-(b)(1); Me. Rev. Stat. Ann. tit. 15, Sec. 711(2). The application, as amended, sought $715,202.12 in attorney fees and costs.[1] In its Order and Memorandum of Opinion dated September 2, 1994, the district court stated that the Application was "unreasonable on its face and grossly inflated" and that it contained "exorbitant costs and numerous instances of inefficient allocation of the law firms' resources." The district court awarded appellants $283,950.58-about 40% of the amount requested.[2] The court arrived at this figure in the following manner:
 
 
 4
 (1) In calculating reasonable fees for services rendered by Kutak Rock, the court used local billing rates, rather than the Washington, D.C., rates requested. Appellants, in defense of this request, claim they could locate no available, qualified local counsel willing to sue Poulos, and therefore Kutak Rock's out-of-town rates were reasonable. The court, however, found that appellants chose Kutak Rock as lead counsel in the wiretap case because Kutak Rock already represented them in the underlying Bowers lawsuit. This adjustment resulted in a reduction of approximately $159,000.
 
 
 5
 (2) The court found that appellants had overstaffed the case, stating that it had "found numerous occasions when Plaintiffs' counsel duplicated efforts" and offering as an example bills from three lawyers for time spent in preparing for and attending Poulos's deposition. The court found that such duplicative billing reflected bad faith and subtracted an additional $100,000 to correct for overstaffing and as a penalty for appellants' bad faith request.
 
 
 6
 (3) On its own, the court calculated reasonable travel expenses from Washington, D.C., to Bangor, Maine, and cut $8,524 from appellants' request. It also declined to allow reimbursement for meal expenses altogether ($1,245), and, citing the inherent cost of coordinating work between law firms, allowed just $11,000 of $34,088 in requested photocopy charges and $6,000 of $16,312 in requested postage, telephone and fax charges. These cuts reduced appellants' requested expense award by a total of $43,169.
 
 
 7
 (4) Noting that appellants had agreed not to seek reimbursement for attorney travel time and computer research charges, the court subtracted $13,575 from the requested total.
 
 
 8
 (5) Finally, apparently to correct for what it called a "misallocation of resources," the court stated that it would divide the tasks performed by appellants' lawyers into three categories and, in accordance with the relative expertise demanded by each task, allow compensation for those services at 50%, 75% or 100% of each lawyer's local rate.[3] Stating that it had "determined to the extent possible based on the information made available by counsel, how many hours fall within each category for each lawyer," the court subtracted an additional $115,000 from the requested fee.
 
 
 9
 Appellants argue that the method the district court used to arrive at a reasonable fee was not in accordance with applicable law and that the court provided insufficient explanations for the cuts that it made. Appellees maintain that, because the district court found, inter alia, that the fee request was "unreasonable on its face and grossly inflated" and at least in part reflected bad faith, it therefore had no discretion to do anything but deny the fee request in its entirety.
 
 II.
 DISCUSSION
 A. Standard of Review
 
 10
 We review a district court's fee award for mistake of law or abuse of discretion. Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992). A district court's discretion in calculating a reasonable fee is particularly broad; this tribunal "lacks the means to replicate the trial court's first- hand knowledge of the litigation and its nuances." Foley v. City of Lowell, 948 F.2d 10, 19 (1st Cir. 1991).
 
 
 11
 Our review, however, is not without bite. We require that the trial court "make concrete findings [and] supply a 'clear explanation of its reasons for the fee award.' " United States v. Metropolitan Dist. Comm'n, 847 F.2d 12, 16 (1st Cir. 1988) (omitting internal citation and quoting Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950 (1st Cir. 1984)). While these demands should not be so great as to cause a district court to "drown in a rising tide of fee-generated minutiae," id., we do expect a court making substantial reductions in a prevailing party's fee request "to spell out the whys and wherefores." Brewster v. Dukakis, 3 F.3d 488, 493 (1st Cir. 1993) (quoting Metropolitan Dist. Comm'n, 847 F.2d at 18). Otherwise, judicial review is next to impossible.
 
 
 12
 Even when we cannot affirm an attorney fees award, however, we need not always remand for more detailed findings. "A request for attorney's fees should not result in a second major litigation." Jacobs v. Mancuso, 825 F.2d 559, 562 (1st Cir. 1987) (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)). When the record provides us with ample resources, then, "much as we dislike the task that has been put upon us," id., we may set forth our own findings and amend the award accordingly. We have done so in the past, see, e.g., id.; Rogers v. Okin, 821 F.2d 22, 31 (1st Cir. 1987); Hart v. Bourque, 798 F.2d 519 (1st Cir. 1986); Grendel's Den, 749 F.2d at 951, and we do so here.
 
 B. The District Court's Methodology
 
 13
 Appellants argue that the district court erred in its failure to use the lodestar framework to determine a reasonable fee. Where the applicable statutory scheme prescribes no alternative method, "we have customarily found it best to calculate fees by means of the [lodestar] time-and-rate-method...." Tennessee Gas Pipeline Co. v. 104 Acres of Land, 32 F.3d 632, 634 (1st Cir. 1994) (quoting Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 526 (1st Cir. 1991) (alterations in Tennesee Gas )). A court employing this method multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate to arrive at the lodestar figure. Hensley, 461 U.S. at 433; Metropolitan Dist. Comm'n, 847 F.2d at 15. To determine a reasonable number of hours, a court may begin with the number of hours actually spent and then subtract "hours which were duplicative, unproductive, excessive, or otherwise unnecessary." Metropolitan Dist. Comm'n, 847 F.2d at 15. (quoting Grendel's Den, 749 F.2d at 950). This is, in fact, essentially what the district court did. It began with the total number of hours appellants' attorneys spent on the litigation, and made deductions for duplicative, excessive and unnecessary billing. While it performed this exercise in an unorthodox manner-deducting lump sums, rather than hours-this was in large part undoubtedly necessitated by appellants' failure to specify the amount of time spent on each task billed and to summarize the hours spent by each attorney on different parts of the litigation. In any event, we have never required that district judges "march in lockstep, following an unyielding, essentially wooden approach in all fee award cases." Id. In fact, we "have left reasonably open the question of precisely how the judge ascertains the number of hours reasonably expended." Tennessee Gas, 32 F.3d at 634 (quoting Metropolitan Dist. Comm'n, 847 F.2d at 15.). While we take issue with some aspects of the manner in which the district court implemented its methodology, we find no error in its choice of methodology per se.
 
 C. Use of Local Rates
 
 14
 Appellants maintain that, in order to obtain meaningful relief from appellees' illegal wiretapping, exigent circumstances left them with no choice but to assign the lion's share of the wiretap litigation to its Washington, D.C., counsel, Kutak Rock. Appellants' local firm in the Bowers litigation, Berman & Simmons, refused to sue Poulos, appellants claim, forcing them to begin an expensive search for new local counsel. After interviewing thirty lawyers, appellants finally found a Maine lawyer-John Whitman, of Richardson & Troubh-willing to take the case, but whose involvement in other litigation prevented him from ever taking over the primary role in the Williams lawsuit. Thus, appellants claim, because they were unable to find suitable local counsel, their decision to use Kutak Rock was entirely reasonable, and the district court erred in limiting reimbursement for Kutak Rock's services to prevailing Maine rates.
 
 
 15
 In general, "the proper rate to apply to the work of out-of-town counsel is that of the forum community, rather than that which the attorney charges in the community in which she practices." 2 Mary Frances Derfner & Arthur D. Wolf, Court Awarded Attorney Fees p 16.03 (1994); see Maceira v. Pagan, 698 F.2d 38, 40 (1st Cir. 1983) ("The reasonable hourly rate is usually stated to be 'that prevailing in the community for similar work.' " (quoting Copeland v. Marshall, 641 F.2d 880, 892 (D.C. Cir. 1980) (en banc))). Nevertheless, out-of- town rates may be applied if the complexities of a particular case require the particular expertise of non-local counsel, Maceira, 698 F.2d at 40, or "when the case is an undesirable one which capable attorneys within the forum community are not willing to prosecute or defend," 2 Derfner & Wolf p 16.03 (1994) (citing cases).
 
 
 16
 While the district court, in its sound discretion, might have found that appellants' lawsuit against Poulos was one that no capable attorney in Maine was willing to prosecute, it did not do so. Instead, it found that appellants were using Kutak Rock in the Williams suit because it already represented them in the underlying Bowers litigation. The same district judge presided over both lawsuits, and his familiarity with the litigants and their counsel, and with the willingness of the local bar to sue one another, far exceeds ours. This was not a ruling on summary judgment; nothing required the district judge to take appellants' self-serving explanations as true. Apparently, he believed that appellants' difficulty in finding suitable local counsel was far less a factor motivating their retention of Kutak Rock than was Kutak Rock's familiarity with the case and its client: this is both an entirely logical conclusion and a finding supportable on the record, given that two local law firms did in fact join the fight against Poulos and the other appellees. Therefore, we do not fault the district court's decision to use prevailing local rates in determining a reasonable fee.
 
 
 17
 That said, the district court's calculation of a reasonable local hourly rate contains a mathematical error of some consequence.[4] To arrive at this rate, the district court divided what it thought was the total requested fee of Kutak Rock-$569,775.24-by the total number of hours Kutak Rock billed-2,867-to arrive at a weighted average billing rate for all Kutak Rock employees of $198.11. The actual average billing rate of all Kutak Rock employees (i.e., the sum of their hourly rates divided by the number of employees who billed) was $131.82. The court noted that the weighted average was approximately 50% greater than the actual average, reflecting that higher-paid lawyers billed the bulk of the hours. It then assigned a local hourly rate to each Kutak Rock employee (roughly equivalent to the rates commanded by the two local firms on the application), computed their average-$95.45-and increased this figure by 50% to arrive at a weighted local average of $143.10. Finally, it multiplied this latter figure by 2,867 hours to arrive at an adjusted local fee request for Kutak Rock of $410,267.70.
 
 
 18
 In fact, the $569,775.24 figure with which the district court began included $68,014 in expenses and did not reflect the adjustments appellants made in their amended Application. Kutak Rock's portion of the adjusted attorney fee request was actually $491,749, and its total adjusted hours were 2,818. Using these figures, and employing the district court's methodology, the adjusted local fee request for Kutak Rock is $356,054.[5]
 
 
 19
 D. Reductions for Duplicative Billing and Misallocation of Resources
 
 
 20
 In deducting $100,000 to compensate for duplicative billing and to penalize appellants for bad faith in requesting such compensation, the district court stated that it had "found numerous occasions when Plaintiffs' counsel duplicated efforts." It provided only one example: bills by three lawyers for time spent in preparing for and attending Poulos's deposition.[6] Appellants argue that, because Poulos was the most important deponent in the case, their deployment of lawyers in the taking of his deposition was entirely reasonable, and, moreover, that this single example cannot possibly sustain a finding of bad faith and a deduction of $100,000.
 
 
 21
 Assuming for the moment that sending three lawyers to a deposition constitutes overstaffing, we agree with appellants that this single example, along with the district court's reference to other, unspecified "numerous occasions" of similar overstaffing, do not constitute a sufficient basis for a finding of bad faith and a combined penalty and deduction of $100,000. Our own scrutiny of the fee application, however, persuades us that the district court's concerns were not entirely unjustified. In addition to the Poulos deposition, for example, two, three or four attorneys attended depositions on May 27-29 and June 11-12, 1992. Four attorneys-two partners from Kutak Rock, one from Richardson & Troubh and one from Murray, Plumb & Murray-billed time for attendance at the preliminary injunction hearing on June 29, 1992. Four lawyers attended-and, we assume, participated in-the trial.
 
 
 22
 We do not mean to underestimate the importance of key depositions or hearings in the course of litigation, or the possible value of employing more than one lawyer at trial. Nor do we question the appellants' contention that this was particularly hard-fought litigation, with appellees raising many time-consuming, frivolous arguments. This was not, however, complex antitrust litigation between two Fortune 500 companies. And, in assessing the reasonableness of a fee request, a court should "ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism." Lipsett v. Blanco, 975 F.2d 934, 938 (1st Cir. 1992). Appellants' arguments that the demands of this case were so great as to warrant extensive work by four partners, and occasional work by additional partners and associates, from three different law firms-and that this strike force of lawyers always divided tasks efficiently-apparently did not persuade the district court. Thus, giving due deference to the district court's general sense that the case was overstaffed, and having scrutinized the fee request ourselves and concluded-as indicated by the above examples-- that there was at least some duplication of effort, we will modify this portion of the district court's order and deduct $40,000 for overstaffing.
 
 
 23
 The district court's decision to deduct $115,000 for misallocating resources suffers from a similar lack of specific examples as well as an analytical flaw. The principle that legal work demanding differing levels of skill and expertise may be compensated differently is firmly established. See, e.g., Jacobs 825 F.2d at 561 n.3 ("Within reason, the court may establish ... multiple hourly rates to reflect differences in the types of services performed for the client."). Here, however, the district court appears to have deducted twice for this differential. First, in calculating the overall fee for Kutak Rock's work, the district court calculated the weighted average of all of Kutak Rock's attorneys at $143.10 per hour, which we have corrected to $126.35. This calculation, however, already accounts for the fact that some work was performed by associates and paralegals. Work that was actually and appropriately performed by these lower-paid employees-i.e., work that falls into the district court's lower-compensated categories-should not then be subject to a further deduction of 25% or 50% of their billing rates. Yet, the district court stated that it arrived at its $115,000 deduction after "determin[ing] to the extent possible based on the information made available by counsel, how many hours fall within each category for each lawyer" and "then reduc[ing] that lawyer's local rate according to the [tripartite] framework." (emphasis added). This was analytically incorrect.
 
 
 24
 As was the case with the deduction for duplicative billing, however, we think the district court's instincts were correct. Of the 3,734 hours billed, partners' time accounted for approximately 80% of that total. This would at least place a court on notice that close scrutiny of resource deployment was necessary. The manner in which the bills were presented, however, made such scrutiny virtually impossible. An entry for a lawyer's work on any given day typically includes several different tasks, but only a single figure reflecting the total number of hours spent on the case that day.[7] Thus, the bills provide no indication of how much time was spent on each task, making it extremely difficult to determine if the lawyers' time was allocated efficiently.
 
 
 25
 Appellants' plaints that, had the district court asked for further explanations, they could have supplied them, are unavailing. We have stated previously that "[i]n order for litigants to receive fee awards ... they [must] submit 'a full and specific accounting of the tasks performed, the dates of performance, and the number of hours spent on each task.' " Tennessee Gas, 32 F.3d at 634 (quoting Weinberger, 925 F.2d at 527). The bills submitted do not contain this level of detail. Attorneys preparing bills in fee-shifting cases in the District of Maine have been specifically warned to account for time spent on each task. Weinberger v. Great N. Nekoosa Corp., 801 F. Supp. 804, 816 n.21 (D. Me. 1992) (determining appropriate fee award despite denying request on other grounds and stating that "[i]n future, the Court admonishes counsel to separate different activities by the discrete amount of time devoted to each activity"), aff'd sub nom, BTZ, Inc. v. Great N. Nekoosa Corp., 47 F.3d 463 (1st Cir. 1995).
 
 
 26
 It has long been the law of this Court that "the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." Tennessee Gas, 32 F.3d at 634 (quoting Grendel's Den, 749 F.2d at 952). Given the significant deficiencies in the Application, and the fact that billing by partners accounted for the vast majority of hours-giving rise at least to a suspicion that resources might have been misallocated, which is unprovable because of the manner in which the bills were prepared-we do not think that a deduction of $115,000 is unreasonable and we will not disturb this portion of the district court's order.
 
 
 27
 E. Deductions for Excessive Expenses, Travel Time and Computer Time
 
 
 28
 We will also leave intact the district court's deduction of about half of appellants' requested expenses. The district court's explanations for these cuts were satisfactorily clear and reasonable.
 
 
 29
 The district court did, however, incorrectly deduct $6,975 in travel time charges and $6,600 in computer research costs. Appellants' requested total of $715,202.12 already reflected the removal of these costs, so they should not have been deducted a second time. We will therefore add back $13,575 to the award to correct for this error.
 
 F. Appellees' Cross-Appeal
 
 30
 Appellees devoted virtually all of their brief and reply brief to arguments explaining why the district court had no discretion to do anything but deny the fee request in its entirety. We will devote considerably less space to this contention. Even assuming arguendo that the district court would have been within its discretion if it had denied the request entirely because of the Application's deficiencies, nonetheless we are extremely hesitant to instruct the court, after it had sifted through hundreds of pages of bills and decided to grant part of the request despite its deficiencies and excesses, that it had no discretion to do so. In Lewis v. Kendrick, 944 F.2d 949, 956 (1st Cir. 1991), we reversed a district court award of attorney fees of approximately $49,000 and held that the plaintiff was entitled to nothing. In that case, however, the district judge had retired, making remand to the trial judge impossible, id. at 954, the plaintiff obtained minimal relief, and the requested fees and costs were approximately 140 times the worth of the damages award, id. at 956. We held in that case that counsel had purposefully defied the caselaw regarding attorney fee requests. Id. This is not such an extreme case. Appellants obtained substantially all the relief that they sought and, while opinions may differ as to what is a "reasonable" fee in this case, we do not think that the record remotely supports a finding of overreaching and bad faith in the Application sufficient to justify the denial of any award at all.
 
 
 31
 Nor do we find merit in appellees' contention that we should remand to allow them to conduct discovery and further contest the propriety of the Application. Appellants' award is substantially less than their original request; discovery in this case would simply be another example of litigious waste. G. Recalculation
 
 
 32
 We now recalculate the award in light of our rulings. The district court awarded $283,950.58. We reduced the adjusted amount for Kutak Rock's fees by $54,213.70. We reduced the deduction for duplicative billing from $100,000 to $40,000 and reinstated $13,575 in incorrect deductions. These adjustments result in a net increase in the total award of $19,361.30. Thus, the total award for appellants' reasonable attorney fees and expenses is $303,311.88.
 
 III.
 CONCLUSION
 
 33
 For the foregoing reasons, the district court order is
 
 
 34
 affirmed in part and modified in part. No costs.
 
 
 
 [1]
 Appellants' initial application for fees and expenses on January 13, 1994, requested a total of $734,389.62. After appellees filed a memorandum with the district court opposing the application, appellants filed an amended application (the Application), deducting $6,600 in computer research charges, $2,125 in telephone surcharges, and $10,462.50 in charges for attorney travel time, reducing the total amount requested to $715,202.12. This amended figure comprised approximately $616,349 in attorney fees and $78,253 in expenses from the three law firms that represented appellants, with expert fees and court reporter costs accounting for the balance. The lion's share of the fees and expenses-approximately $491,749 in fees and $59,589 in expenses-requested in the Application were billed by Kutak Rock, the Washington, D.C., law firm that served as appellants' lead counsel. The Application includes fees and expenses totalling approximately $96,777 billed by Richardson & Troubh, appellants' Maine counsel, and approximately $46,463 billed by Murray, Plumb & Murray, counsel for Ralph Dyer, intervenor in the Williams lawsuit. Dyer did not appeal from the district court's order awarding reduced fees. However, because the district court based its decision on the propriety of the entire Application, and because appellees contend that the entire Application should be denied, we consider the fees and expenses billed by Dyer's counsel in our analysis
 
 
 [2]
 The total award comprised $246,741.58 in attorney fees and $37,209 in costs
 
 
 [3]
 Services compensated at 50% included: "conferences with co-counsel and opponents; proofreading and copyreading; notification and preparation for depositions; review of documents; telephone conversations."
 Services compensated at 75% included: "general research; taking and attendance at depositions; letter drafting; drafting and reading of memoranda; preparation for hearings and court conferences; discovery activity."
 Services compensated at 100% included: "court appearances, in-chambers conferences, and the preparation and drafting of motions and briefs."
 
 
 [4]
 To their credit, appellants directed our attention to this error, even though correcting it results in a lower local hourly rate
 
 
 [5]
 We arrived at this result as follows:
 1) $491,749 2,818 = $174.50 (weighted average rate)
 2) $95.45 X ($174.50/$131.82) = $126.35
 3) $126.35 X 2,818 = $356,054.30
 
 
 [6]
 In fact, the Application includes billing entries from five lawyers who attended at least part of Poulos's deposition: two from Kutak Rock, one from Richardson & Troubh, and two from Murray, Plumb & Murray
 
 
 [7]
 As an example, we cite the billing entry for Kutak Rock partner Ronald Massumi for March 15, 1993, totalling 6.25 hours at a cost of $1,093.75:
 Conference with Mr. Rugg regarding appellate procedure; telephone conference with Mr. Murray's office; correspondence to Mr. Whitman; research regarding injunctions pending appeal, federal rules of civil and appellate procedure, 1st Circuit caselaw on stays/injunctions pending appeal, notice of appeal procedure; draft motion for injunction pending appeal, and memorandum in support of motion for injunction pending appeal.