Carlos **MORALES FELICIANO**, et al., Plaintiffs,

v.

Rafael **HERNANDEZ COLON**, et al., Defendants.

**Civ. No. 79-4(PG).**

United States District Court, D. Puerto Rico.

Sept. 20, 1988.

As Amended Sept. 23, 1988.

See also 697 F.Supp. 37.

Francisco G. Bruno, San Juan, P.R., for plaintiffs.

Carlos Del Valle, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

Under our consideration are applications for interim attorney's fees submitted by five of plaintiffs' attorneys: Messrs. Harvey Nachman, Rafael Pérez Bachs, Harry

Anduze, José Fernández Seín and Carlos Ramos. The applications cover the hours worked until November 30, 1987. Attorneys for plaintiffs and for defendants have exchanged documents as to the hours worked in this case and rates charged in this as well as other cases. A two-day hearing was held in which all applicants testified as witnesses on their own behalf and submitted documentary and expert evidence in support of their applications.[1] Before going into the applications' merits, a brief summary of this litigation is a necessary background.

## I.

Plaintiffs are all persons incarcerated under the custody of the Administration of Correction of the Commonwealth of Puerto Rico, and the defendants are the Governor of the Commonwealth, the Administrator of Correction, as well as the present and some former members of the Parole Board of the Commonwealth. The action was commenced by a complaint filed on February 7, 1979,[2] and certified as a class action on April 9, 1979. Plaintiffs alleged the conditions of confinement violated their rights under the United States Constitution as well as the laws and Constitution of the Commonwealth.

After more than a year of bitterly contested discovery, plaintiffs filed a motion for a preliminary injunction for emergency, provisional and extraordinary relief to halt the alleged violations. On May 7, 1980, we issued an order to show cause why the requested injunction should not be granted. A month-long hearing on the motion was held. On September 5, 1980, we granted emergency relief as to the most pressing health and custodial maladies within the prison system. *Feliciano v. Barceló*, 497 F.Supp. 14 (D.P.R.1981). Patent violations

to the Eighth Amendment to the U.S. Constitution sufficed as a basis to our order. *Id.* at 18. Thirty-eight days of hearing followed during the November 1980 to March 1987 period. Convinced that the chaotic conditions would take time to mend, we gave defendants some leeway to come up with a major reform plan.

During the years between 1981 and 1985 some short-lived efforts were made by defendants to comply partially with the preliminary injunction. To corroborate it, the Court visited most of the penal institutions on the Island. Evidentiary hearings were held. Finding that the constitutional violations continued and, thus, that compliance would not come about voluntarily, the Court had no choice but to appoint monitors on March 21, 1986. *Morales Feliciano v. Romero Barceló*, 672 F.Supp. 591 (D.P.R.1986). The Court was particularly shocked at the intolerably overcrowded condition of most penal institutions.

The first formal act of the monitors, undertaken with the Court's express approval, was to convene negotiations to address the overcrowding crisis. After several months of gathering information and negotiating as to living space in the different institutions, the parties signed a stipulation on the overcrowding issue. Defendants were to provide 35 feet of living space per inmate by December 31, 1986. They had been ordered to provide that space since 1980. This Court approved the stipulation and transformed it into its order on January 26, 1987.

A month later the monitors filed a report as to defendants' compliance with the stipulation. Defendants had not complied. Plaintiffs moved for contempt and imposition of civil sanctions. Hearings were held. On July 23, 1987, this Court found defendants in contempt of the January order,

---

**1.** At the beginning of the hearing defendants attempted to submit a so-called "hearing aid brief" that we disallowed. At the end of the hearing, they again tried to submit it as a post-hearing brief. We reiterated our rejection convinced that our acceptance would be unfair to plaintiffs' attorneys, who would not have had an opportunity to oppose the brief. Defendants had a chance to present their challenges to the claimed hours and fees during the hearing, where we would have had the benefit of face-to-face confrontation.

**2.** This action originated as a letter complaint filed on January 2, 1979. After petitioner was allowed to proceed in *forma pauperis* and an attorney was named to represent him, the formal complaint was filed on this date.

fined them for $50,000, and imposed a prospective daily fine of $10 for each inmate above stipulated institutional capacity, 697 F.Supp. 26. Defendants moved for relief of their obligation to provide the required living space. The motion was denied. *Morales Feliciano v. Hernández Colón*, 672 F.Supp. 627 (D.P.R.1987).

Since then defendants have been fined every day for violating the stipulation. During February and March of the current year they were close to fully complying with it. Unfortunately, this effort was short-lived. Defendants have been paying biweekly fines of over $25,000 since May 13. By July the biweekly fines were of over $80,000. Given this pattern of non-compliance, we decided to increase the fine per inmate held in violation of the stipulation to $50 a day beginning on September 1 and an automatic increase of $10 per inmate for every upcoming month in which defendants fail to comply. Furthermore, we ordered the Ponce District Jail to commence a phase out to be completed by December 31, 1988.

## II.

Eight attorneys have represented plaintiffs at some point during this litigation. Two of them have already settled their fees with defendants. Messrs. Nachman, Pérez Bachs, Anduze, Fernández Seín and Ramos await our award.[3]

Mr. Nachman was the first lawyer we tapped to represent plaintiffs. He is their lead counsel, the mastermind behind the whole case. He has been a litigator ever since he graduated from Columbia University School of Law and started practicing in 1950. Mr. Nachman is among the three better plaintiffs' lawyers of our bar. His expertise in civil rights cases is indisputable. In his fee application, Mr. Nachman claims to have worked 2,810 hours and asks us to award each hour worked at $200, his current hourly rate. His rates during the years of this litigation have increased in the following manner: $125

between 1979 and 1980; $150 between 1980 and 1986; $175 between 1986 and 1987; and since January 1, 1988, $200. Most of his work, however, is done on a contingency basis.

Mr. Pérez Bachs became involved in this litigation in 1979, when four cases in which he represented maximum security prisoners were consolidated with the one at hand. He has been litigating since his graduation from the University of Puerto Rico Law School ("U.P.R. Law School") in 1971. He is currently a partner in Puerto Rico's largest law firm, where he works as a corporate litigator. Mr. Pérez Bachs is undoubtedly one of the premiere litigators of his kind. Although he rarely worked or works on civil rights litigation other than this case, at the time of its inception he had been working on prisoners' cases for over two years. That experience made Mr. Pérez Bachs an "expert" on such cases given the only handful of attorneys then accepting prisoners' representation. In his fee application Mr. Pérez Bachs asks us to award him fees for 385.75 hours of work at a rate between $140 and $160 per hour. The bulk of his labored hours occurred during the early years of this litigation, including some worked prior to the consolidation. He has been almost completely inactive in this case since 1982. His hourly rates during the years of this litigation have increased in the following fashion: 1976—$70; 1977—$80; 1978—$90; 1979—$100; 1980—$110; 1981—$125; 1982—$135; 1983—$140; 1984—$150; 1985—$160; 1986—$170; 1987—$170; 1988—$180.

Mr. Anduze was recruited by Mr. Nachman to join the case in 1979. His initial task was to teach a prisoners' rights seminar to Legal Services' ("Legal Services") attorneys along with Messrs. Nachman and Fernández Seín, in exchange for which Legal Services was to pay for the expenses incurred by plaintiffs' attorneys during the early years of this litigation and to provide the help of three of Legal Services' lawyers

---

**3.** Mrs. Ivonne Santiago submitted her application, belatedly, on September 9, 1988. We will

be ruling on it very soon.

for this case. Although Mr. Anduze does not have the years of experience Mr. Nachman does, he is also one of the shining stars of our plaintiffs' bar as well as an excellent criminal defense lawyer. He has been litigating since his graduation from the U.P.R. Law School in 1968, with a three-year interruption (1969–1972) while he served in the armed forces. From 1972 to 1979 he was associated with the law firm of Calderón, Rosa–Silva and Vargas. He has been a solo practitioner since 1979. Mr. Anduze claims 869.25 hours of work to be paid at a rate of $150 per hour. He has not had fixed billing rates since being on his own. Most of his work is done on a contingency basis. He testified that his rates during the 1979–80 period fluctuated between $100 and $150 and his current rates vary between $100 and $200. Mr. Anduze states in his application that $150 is "his current billing rate."

Mr. Fernández Seín was recruited by Mr. Nachman in 1978. They struck a deal under which Mr. Nachman provided Mr. Fernández Seín with office space in exchange for 25 hours of work a month in this case. Mr. Fernández Seín graduated from the U.P.R. Law School in 1966. Between 1966 and 1973 he litigated with private firms, mostly on behalf of insurance companies. From 1973 to 1976 he worked for the Commonwealth government, first as legal counsel to the Right to Work Administration and then as a Special Assistant to the Governor. In 1977 he joined Legal Services as a staff attorney for its litigation division. A year later he was promoted to supervisor of his division, position that he held until 1979. During his years at Legal Services, Mr. Fernández Seín became very involved in the prisoner's rights cause. He filed several class actions on behalf of prisoners. With Mr. Pérez Bachs, he was one of the Island's very few "experts" in prisoner's cases at the commencement of this case. Mr. Fernández Seín shared office space with Mr. Nachman until becoming his associate in 1983 and his full partner in 1984. He requests an award for 2,480 hours worked to be paid at $150 an hour. We do not know what were his hourly rates from 1979 to 1983. Since then

his rates have been $125 per hour between 1984 and 1985, and $150 per hour since January 1986. Like Mr. Nachman, however, most of his work is done on a contingency basis.

Mr. Ramos joined the team of plaintiffs' attorneys in 1979 while working at Legal Services. He was one of the three lawyers Mr. Nachman bargained in exchange for the seminars. Mr. Ramos was employed by Legal Services in January 1979, some months after his graduation from the U.P.R. Law School. He remained there until late 1980, when he joined the faculty of the Inter American University Law School. Among other courses, he has taught a prisoner's rights seminar since joining the faculty. He has remained active in this case while teaching and has acted as court-appointed counsel in several other prisoners' and civil rights cases in this as well as the Commonwealth courts. He took a sabbatical year between 1986 and 1987 to obtain his Master in Law degree from the University of California at Berkeley. Mr. Ramos requests an award for 582.5 worked hours at $100 per hour. All hours claimed occurred after he left Legal Services. He has never had any fixed billing rates because he has not assumed any representation on such basis.

### III.

A brief summary of the fees' proceeding must be told. On prior occasions we have noted the contentiousness and the excessive adversariness with which defendants have met the claims made by the plaintiff class. *Feliciano*, 497 F.Supp. at 17; *Morales Feliciano*, 672 F.Supp. at 595; and *Opinion and Order* of July 28, 1988, 697 F.Supp. at pp. 47–48. This incident is no exception to the stonewalling, dilatory tactics used by the defendants. They have made every attempt to make sure that "[t]his fee litigation [would result] in what the Court in *Hensley* warned against; 'a second major litigation.'" *Rogers v. Okin*, 821 F.2d 22, 28 (1st Cir.1987), *quoting Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Months before the hearing on these appli-

cations, defendants had received from plaintiffs' attorneys statements in support of their applications. These statements itemized for each attorney the service for which payment was claimed as well as the date and the time spent on each occasion. A few days before the date in which the hearing was first scheduled, defendants moved to take depositions and for production of documents. We denied the motion for the taking of depositions, modified the request for production of documents and granted the defendants additional time to prepare for the hearing.

Not unexpectedly, the showing made by defendants at the hearing was weak. Broad-gauged attacks on duplication of work or challenges to the claims made by plaintiffs' attorneys followed the same pattern of litigation that has characterized this case. The fact that an immense amount of work had been performed for the plaintiff by first-rate lawyers could not be contested. We had anticipated attacks on particularized claims to match the requests for information and for time to prepare for this hearing. The defendants never went beyond vagueness and protestation.

The one witness which the defendants brought before the Court only established the bad faith with which he had been treated by the defendants. Jorge Segarra Olivero, Esquire, Executive Director of Puerto Rico Legal Services, Inc., had settled the claims made by that corporation on the clear understanding that he would not be required to give evidence on this matter. Defendants nevertheless subpoenaed him, by surprise, to try and elicit from him the testimony which they had agreed not to require from him.

The applicants base their fee award petition on 42 U.S.C. § 1988 (1981). Since the claim on which we have ruled as to the unconstitutionality of the prison system is based on 42 U.S.C. § 1983 (1981), we "may allow the prevailing party ... a reasonable attorney's fee as part of the costs." Plaintiffs clearly are prevailing parties under section 1988. *Nadeau v. Helgemoe,* 581 F.2d 275, 278–279 (1st Cir.1978). We so

held on March 20, 1986. Defendants have not challenged that fact. We will thus award reasonable fees in favor of plaintiffs' attorneys.

█ It is settled law that to calculate attorney's fees under section 1988 a two-step process must be followed. *Hensley v. Eckerhart,* 461 U.S. 424, 433–434, 103 S.Ct. 1933, 1939–1940, 76 L.Ed.2d 40 (1983). We first have to multiply hours reasonably expended by each prevailing attorney times a reasonable hourly rate, to arrive at the "lodestar" of a reasonable fee. This lodestar is "presumed to be the reasonable fee to which counsel is entitled." *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*). Then we may, in exceptional cases, make upward adjustments to the lodestar figure in light of various factors which are not accounted for in it, such as risk of nonpayment, delay in payment, and undesirability or importance of the case. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* —— U.S. ——, 107 S.Ct. 3078, 3081–3082, 97 L.Ed.2d 585 (1987) (*Delaware Valley II*).

### A.

█ To determine the number of reasonable hours that each of plaintiffs' attorney should be paid for, we take the "hours actually spent and then substract from that figure hours which were duplicative, unproductive, excessive or otherwise unnecessary." *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). During the attorneys' fees hearing defendants made general allegations that plaintiffs' attorneys overstaffed court appearances and negotiation meetings.[4] Defendants unfortunately did not specify which hours should have been reduced. Notwithstanding, we do not think their allegations have any merit.

█ As explained during the hearing, and a matter of which this Court has intimate knowledge, plaintiffs' attorneys had to divide up their work by "committees".

---

**4.** See August 15, 1988, Transcript ("Tr. 8/15/88"), pp. 107–110.

During the discovery period in 1979 and 1980, they split among themselves the nineteen penal institutions involved in this case. When the time came to argue the 1980 preliminary injunction in court or when the 1986 stipulation was negotiated, lawyers with first-hand knowledge of all institutions had to be present. Furthermore, the work was also divided by tasks. Messrs. Fernández Seín, Nachman and Ramos did most of the discovery and, thus, had a better command of the facts. They obviously had to be present in court or at the negotiating table. Mr. Anduze did not do much field work, but co-counsel needed him to be on top of all the technical aspects of courtroom appearances. His expertise in such matters made him the perfect choice for that task. In sum, the factual and procedural complexity of a class action challenging the constitutionality of the confinement conditions in nineteen penal institutions required the presence of the plaintiffs' attorneys that appeared in court or at the negotiating table.

█ Defendants did not make any other specific challenges to the reasonability of the claimed hours. They rightly did not do so because the claimed hours are more than reasonable. This Court knows that all applicants underrepresented the hours worked in this case. They so testified during the hearing without being challenged by defendants. A couple of examples illustrate our point. During 1983 Mr. Nachman claims compensation for 9.5 hours and calculates that at least 100 hours were not reported because of difficulty in reconstructing time records. We know that he worked more than 9.5 hours that year and that his underrepresentation estimate for that year is very modest. Mr. Pérez Bachs' claimed hours offer another fine example. He asks for compensation for time spent on only 2 phone calls, 2 visits to institutions and 2 meeting with co-counsel. He certainly did many more than those in 12 years of litigation. We could go on and on with such examples.

Finally, we believe that the claimed hours are more than reasonable in light of defendants' contentiousness and lack of compliance with this Court's orders. It must be stressed that the prison conditions were declared unconstitutional more than eight years ago. Plaintiffs' attorneys are still litigating this case because of defendants' irresponsibility. And, as we have held before, *Feliciano*, 479 F.Supp. at 17; *Morales Feliciano*, 672 F.Supp. at 595, defendants' conduct throughout the whole litigation has been, to put it mildly, obstreperous. They have opposed, sometimes viciously, every discovery attempt or motion by plaintiffs.[5] "The government cannot litigate tenaciously [in this case, excessively] and then be heard to complain about the time necessarily spent by plaintiffs in response." *Jacobs v. Mancuso*, 825 F.2d 559, 562 (1st Cir.1987), *quoting from, City of Riverside v. Rivera*, 477 U.S. 561, n. 11, 106 S.Ct. 2686, n. 11, 91 L.Ed.2d 466 (1986).

In light of all that has transpired in this case, we will compensate plaintiffs' attorneys for all the hours claimed in their applications—Mr. Nachman for 2810 hours; Mr. Pérez Bachs for 385.75 hours; Mr. Anduze for 869.25 hours; Mr. Fernández Seín for 2480 hours; and Mr. Ramos for 582.5 hours.

### B.

█ As to the reasonable compensation for each hour worked, plaintiffs' attorneys believe to be entitled to be paid at their current hourly billing rates (except for Mr. Ramos, who does not have fixed rates). As previously indicated, their billing rates have increased periodically since the commencement of this case—Mr. Nachman's from $125 to $200; Mr. Pérez Bachs' from $70 to $180; Mr. Anduze's from $100–150 to $100–$200; and Mr. Fernández Seín's from $125 (in 1984) to $150. They want to be paid current rates given the close to nine years of inflation depreciating the value of the dollar and the lost interest income

---

**5.** The latest example was the Secretary of Justice's complete disobeyance of this Court's July 13, 1986, order to produce documents in relation to the attorneys' fees issue. We could have held him in contempt but reluctantly refrained from doing so because that would have further delayed the attorney's fees award.

that could have been generated if fees had been paid when their services were provided.

We sympathize with plaintiffs' argument but are constrained by our Court of Appeals decision in *Rogers v. Ohio*, 821 F.2d 22 (1st Cir.1987), which itself was bound to apply the principles in *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). The *Rogers* holding is clear: unless the sovereign, in this case the Commonwealth, waives its immunity under the Eleventh Amendment, we can neither award lost interest nor take into consideration the delay-in-payment factor when assessing a reasonable fee under 42 U.S.C. § 1988. *Rogers*, 821 F.2d at 26–27. By ignoring this key factor we believe to be unduly penalizing plaintiffs' attorneys. Unfortunately, there is nothing we can do but echo our Court of Appeals' request:

> We are not happy about this result from a policy standpoint; indeed, particularly where private and unfunded counsel are expected to be enlisted to assist the private attorney general plaintiff[s], one can hardly overestimate the chilling effect of an interminable wait for payment in sharply shrunken dollars. The situation cries out for congressional remedy.

*Rogers*, 821 F.2d at 28.

We have no choice but to do what the *Rogers* court did: use the attorney's historical rates as a point of reference in determining a reasonable fee. As to Messrs. Anduze and Fernández Seín, of whom we do not have historical rates for some years or, as to Ramos, who has no such rates, we will have to determine what would have been their reasonable historical rates for those years.

It is fair to treat Messrs. Anduze and Fernández Seín as one person for purposes of assessing rates. They have been practicing law for almost the same number of years (Mr. Anduze, 20 years; Mr. Fernández Seín, 22 years). Both have been actively litigating civil rights cases since the late 1970's. Mr. Fernández Seín has been involved in this case maybe a few months longer than Mr. Anduze. They are equally well-respected within the Puerto Rican legal community.

As noted before, *supra*, pp. 54–55, both of them offered some testimony as to historical rates. Mr. Anduze said his 1979–80 hourly rates ranged from between $100 and $150 and currently go from between $100 and $200. He indicated in his application that $150 is his current rate. Mr. Fernández Seín's historical rates were $125 during the 1984–85 period and since January 1986 they have been fixed at $150. We also have rates that they have been assigned in previous civil rights cases. Mr. Anduze's hours were valued at $150 for in-court and $100 for out-of-court in a recent civil rights case. Mr. Fernández Seín has been awarded fees by this Court in the following civil rights cases: *Morales v. Romero Barceló*, Civil No. 80–1783—$100 per hour awarded in 1983; *Wildman v. Lerner Stores*, 771 F.2d 605 (1st Cir.1985) —$100 per hour awarded in 1984; *Vázquez v. Racing Sport Adm.*, Civil No. 82–2796— $100 per hour awarded in 1984; *Cristóbal v. Romero Barceló*, Civil No. 81–0006— $125 per hour in 1986; *Valdivieso v. Burgos*, Civil No. 82–1430—$125 per hour in 1986; *Baldomero Arbona v. Awilda Aponte Roque*, Civil No. 85–1367—$150 per hour awarded in August 11, 1988.

With all this professional background and fee data in mind, we fix Messrs. Anduze's and Fernández Seín's historical hourly rates in the following fashion: $110 for the 1979 and 1980 years; $120 for the 1981 and 1982 years; $130 for the 1983 and 1984 years; $140 for the 1985 and 1986 years; and $150 for 1987. The $10 increase every two years is to reflect what is obvious to all of us in the legal profession: an attorney's rate goes up as he or she accumulates years of experience. We believe these rates are reasonable approximations of what would have been the prevailing market rates for civil rights lawyers with the skill, experience and reputation of Messrs. Anduze and Fernández Seín.

Mr. Ramos stands on a different footing. He has been practicing law for nine years. Although we have only but praise for his abilities as a litigator, his experience in

court is far less than those of his fellow attorneys. Knowing the legal fees' market, these factors would have certainly been reflected in the rates Mr. Ramos could have commanded if he had worked on a fixed rate basis. With that in mind, we believe the market would have valued Mr. Ramos' hourly rate in the following fashion: $60 an hour during 1980 and 1981; $80 an hour during 1982 and 1983; $100 an hour during 1984 and 1985; and $120 an hour in 1986 and 1987. The $20 increase every two years is to account for the fact that, as we said before, lawyer's rates go up with years of experience. The bianual increases are higher than those we assigned to Messrs. Anduze and Fernández Seín because the experience a young lawyer acquires during the early years of his or her career is usually more valuable than what he can learn after fifteen or twenty years in the profession.

The rate-fixing task does not end with the determination of historical rates. We also must assign different rates to different tasks following the practice approved by our Court of Appeals and the Supreme Court of the United States. *See United States of America v. Metropolitan District Commission*, 847 F.2d 12, 19 (1st Cir.1988); *Jacobs*, 825 F.2d at 561, n. 3; *Miles v. Sampson*, 675 F.2d 5, 9 (1st Cir. 1982); *Furtado v. Bishop*, 635 F.2d 915, 920 (1st Cir.1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980); *Delaware Valley I*, 106 S.Ct. at 3099.

Two factors come to mind in trying to differentiate the tasks performed by plaintiffs' attorneys in this case: (a) how much legal skill and ability is required by the task; and (b) how emotionally and mentally demanding is the task. For example, an hour in court or brief-drafting will be more valuable than fact-finding tasks, which in this case would be, among others, visits to the prison or interviews with prisoners. By the same token, since an hour of deposition-taking is usually not as legally and mentally exacting as an hour of writing letters or reviewing documents, the former will be priced higher than the latter.

In light of those principles, we have divided up the tasks performed by plaintiffs' attorneys in three categories. They will be awarded a fraction of or full historical hourly rate depending on which category the task falls. The categories are:

1) Low: includes notifications and visits to the penal institutions; prisoners' interviews; conferences with co-counsel or adversaries (unless otherwise categorized); drafting of letters; drafting and reading of intra-counsel memoranda; proofreading and copyreading; notification of and preparation for depositions; review of documents; telephone conversations; and travel time.

Hours falling under the low category will be compensated at 60 percent of the applicable historical rate.

2) Medium: includes general research; taking of and attendance to depositions; preparations for court hearings or conferences (if so specified on the time records); preparation of subpoenas, class notices, interrogatories and answers to them, prisoners' questionnaires, and affidavits; unspecified meetings with monitors; preparation for prisoner rights' seminar; and preparation of fee applications.

Hours falling under the medium category will be compensated at 80 percent of the applicable historical rate.

3) High: includes court appearances and in-chambers conferences; legislature and administrative agencies' appearances; jail visits with the judge; preparation and drafting/dictation of motions and briefs; negotiations toward stipulation with court monitors and defendants.

Hours falling under the high category will be compensated at the full applicable historical rate.

The composition of the team of plaintiffs' counsel compels us to implement the categories. Four out of the five applicants command very high hourly rates, and rightfully so, given their skill and reputation. This case had to be managed by lawyers of their caliber. By the same token, not all tasks to be performed had to be done by lawyers of their extraordinary capacity.

An analogy with a large law firm illustrates our point. If plaintiffs would have been represented by such a firm, tasks in the low and medium categories could have been delegated, partly or totally, to associates or junior partners charging a lower fee. By valuing the applicants' claimed hours at 60 or 80 percent of their historical value, we superimpose such hierarchy in an attempt to arrive at a reasonable fee award.[6] The use of the historical rates as a reference point reflects the fact that, although task differentiation is appropriate, we must not forget their skill and reputation. An "associate hour" of work by any of the applicants will obviously be more efficient and, therefore, more valuable, than a "real associate" hour.

## IV.

The implementation of the guidelines in Part III of this opinion result in the following "lodestars":[7]

| | |
|---|---|
| Mr. Nachman: | $337,422.50 |
| Mr. Pérez Bachs: | $35,235.00 |
| Mr. Anduze: | $84,197.50 |
| Mr. Fernández Seín: | $228,151.50 |
| Mr. Ramos: | $41,075.00 |

■ These "lodestars" are "presumed to be the reasonable fee to which counsel are entitled." *Delaware Valley II*, 106 S.Ct. at 3098, *quoting from Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). We believe, however, that this is one of the exceptional cases where an upward adjustment is appropriate based on three factors:[8] (a) The undesirability of this case, (b) the public importance of this

case, and (c) counsel for plaintiffs' preclusion of more remunerative employment due to the acceptance of this case. An explanation ensues.

Plaintiffs' representation is undesirable because their cause is unpopular. The prisoners' cause is repudiated in a community, like Puerto Rico, infested with crime. The Island's largest cities, San Juan and Ponce, have among the worst murder-per-capita rates in the United States. Robberies, rapes, drug deals, and other felonies are so common Puerto Ricans see them as part of every day life. The general population's attitude toward those who commit or are accused of committing crimes is understandably one bordering in despise. Many Puerto Ricans believe that since plaintiffs are criminals, they deserve the conditions under which they live in the prisons. We must also note that Puerto Rico is decades behind the United States in the prisoners' rights movement. While prisoners in the States fought over their rights to law books in the 1970's, Puerto Rican prisoners fought, and are still fighting, over a humane amount of living space. Prisoners' rights had been completely ignored by our government and, sadly, by our legal community until the commencement of this litigation.

The case is also undesirable because it involves grueling work. In January 1989, this litigation will be ten years old. More than a thousand motions have been filed. Transcripts of in-court proceedings cover hundreds of pages. Expert witnesses had

**6.** We start categorizing Mr. Ramos' hours after 1985, when he becomes a "partner" in this imaginary law firm. Pre-1985 hours are valued at "associate" rates and, thus, need not be further reduced through categorization. After 1985, his hours in the low and medium categories are priced at 75 percent of his historical rate.

**7.** See Appendixes A and B for an annual breakdown per category for each applicant.

**8.** We would have considered another enhancement factor, risk of loss, but unfortunately plaintiffs' attorneys did not present the quite specific evidence required in *Delaware Valley II.* That case sets forth two criteria for awarding such enhancement. Justice O'Connor together with four dissenting justices (Blackman, Brennan, Marshall and Stevens) held that "compen-

sation for contingency must be based on the difference in market treatment of contingent fee cases *as a class,* rather than on an assessment of the riskiness of any particular case." *Delaware Valley II,* 107 S.Ct. at 3089. (O'Connors, J. concurring) A different majority (Chief Justice Rehnquist and Justices White, Powell, Scalia and O'Connor) held that "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market'." *Id.* at 3091 (O'Connor, J. concurring, *quoting* White, J. plurality) Plaintiffs' attorneys made neither showing. *See McKenzie v. Kennickell,* 684 F.Supp. 1097 (D.D. C.1988).

to be procured in the United States. Videos and hundreds of photos were taken and introduced into evidence.

This is not the typical plaintiff in a civil rights' case who knocks on the lawyer's door. Access to plaintiffs was a severe problem. Plaintiffs' counsel had to travel throughout the Island's twenty-four institutions to visit their clients, a task made more difficult when prisoners are being constantly moved from institution to institution to prevent them from consulting with their lawyers. Hundreds of inmates were interviewed. A further complication was that plaintiffs' attorneys had to rely on their clients' word as to prison conditions. Before we ordered defendants to open up the institutions, plaintiffs' attorneys were not allowed to visit them. It is a very difficult task to build up a case when a lawyer is unable to investigate the facts for himself. Finally, and more importantly, having to go in and out of prisons for nine years is undesirable in itself, and that normal discomfort reaches depressive levels when the institutions are as ill-kept as those under defendants' control. We have commented extensively on the institutions' grim conditions elsewhere. *See Feliciano,* 479 F.Supp. 14; *Morales Feliciano,* 672 F.Supp. 591. Plaintiffs' lawyers have had to deal with the Island's prison bureaucracy, which has demonstrated to be totally inefficient and uncooperative.

The case's undesirability is further compounded by its economic effects on the practice of plaintiffs' counsel. Applicants in private practice have spent many hours of billable time in this case when they could have been billing rates higher than those we have allowed them or taking cases on contingency basis that would have resulted in higher paychecks.[9] To illustrate our point, we have allowed them to charge 60 or 80 percent of what were or would have been their historical rates for 59 percent of the hours claimed by Mr. Nachman; 56 percent of the hours claimed by Mr. Pérez Bachs; 49 percent of the hours claimed by Mr. Anduze; and 68 percent of the hours

claimed by Mr. Fernández Seín. Of course, we recognize that their billing rates "at best afford relevant comparisons," *U.S. v. Metropolitan District Commission,* 847 F.2d 12, 17 (1st Cir.1988), *quoting from Blum,* 465 U.S. at 895–896 n. 11, 104 S.Ct. at 1547–1548 n. 11 and, that we are therefore not compelled to base our award on those rates. "It is precisely because there is no external market-based check upon the scope of counsel's efforts in such a case that it falls to the court to act as the guarantor of fairness." *Metropolitan,* 847 F.2d at 17. On the other hand, we may not completely ignore the aforementioned percentages, especially knowing that these lawyers did not take this case voluntarily.

The public importance of this case is enormous. Plaintiffs' attorneys are the pioneers of the prisoners' rights movement in Puerto Rico. Without their initiative, more than 8,000 citizens would probably still be held under custody in violation of their basic constitutional rights. Plaintiffs' attorneys took it upon themselves to achieve an imperative prison reform and at least have laid out a solid ground on which to build it. They have not done more because of defendants' protraction. It is up to defendants to comply with the minimal requirements this Court has imposed.

■ Quantifying these three award enhancement factors is far from an exact science. But mindful of the frowning at multipliers in recent case law of our Court of Appeals and the Supreme Court, *Delaware Valley I,* 106 S.Ct. at 3098; *Cortés Quiñones v. Jiménez Nettleship,* 842 F.2d 556, 564 (1st Cir.1988), we will increase each applicant's lodestar a minimal 10 percent for each factor applicable to him. In other words, the lodestars of Messrs. Nachman, Pérez Bachs, Anduze and Fernández Seín will be increased by 30 percent and Mr. Ramos' lodestar will be increased by 20 percent. The awards will therefore be:

| | |
|---|---|
| Mr. Nachman: | $438,649.25 |
| Mr. Pérez Bachs: | $45,805.50 |
| Mr. Anduze: | $109,456.75 |

---

9. Mr. Ramos is not affected by this economic factor because he is not in the private practice. Working on this case certainly has precluded him from doing more enjoyable things but not from assuming more remunerative representations.

Mr. Fernández Seín:    $296,596.95
Mr. Ramos:             $49,290.00

IT IS SO ORDERED.

### APPENDIX A

This is a breakdown, by the categories defined in Part B III of the opinion, of the annual fees (without multipliers) we are awarding in favor of Messrs. Nachman, Pérez Bachs, Anduze and Fernández Seín. The following is the model/description of how the calculations were made:

*YEAR X (year X's historical rate)*

*Low* category hours claimed × 60% of year X's historical rate = fees awarded for low category hours in year X.

*Medium* category hours claimed × 80% of year X's historical rate = fees awarded for medium category hours in year X.

*High* category hours claimed × 100% of year X's historical rate = fees awarded for high category hours in year X.

Total hours claimed for year X/Lodestar (total fees awarded (without multiplier) for year X).

### MR. NACHMAN

1979 ($125)

| | | | |
|---|---|---|---|
| 192.5 | × $ 75 = | $14,437.50 |
| 63 | × $100 = | 6,300.00 |
| 36.5 | × $125 = | 4,562.50 |
| 292 | | $25,300.00 |

1980 ($150)

| | | | |
|---|---|---|---|
| 596.75 | × $ 90 = | $ 53,707.50 |
| 169.25 | × $120 = | 20,310.00 |
| 608.25 | × $150 = | 91,237.50 |
| 1374.25 | | $165,255.00 |

1981 ($150)

| | | | |
|---|---|---|---|
| 160.5 | × $ 90 = | $14,445.00 |
| 16.75 | × $120 = | 2,010.00 |
| 234.75 | × $150 = | 35,212.50 |
| 412 | | $51,667.50 |

1982 ($150)

| | | | |
|---|---|---|---|
| 19 | × $ 90 = | $ 1,710.00 |
| 0 | × $120 = | 00.00 |
| 62.25 | × $150 = | 9,337.50 |
| 81.25 | | $11,047.50 |

1983 ($150)

| | | | |
|---|---|---|---|
| 3.5 | × $ 90 = | $ 315.00 |
| 0 | × $120 = | 00.00 |
| 6 | × $150 = | 900.00 |
| 9.5 | | $1,215.00 |

1984 ($150)

| | | | |
|---|---|---|---|
| 56.75 | × $ 90 = | $ 5,107.50 |
| 7 | × $120 = | 840.00 |
| 38.5 | × $150 = | 5,775.00 |
| 102.25 | | $11,722.50 |

1985 ($150)

| | | | |
|---|---|---|---|
| 66 | × $ 90 = | $5,940.00 |
| 7.75 | × $120 = | 930.00 |
| 6 | × $150 = | 900.00 |
| 79.75 | | $7,770.00 |

1986 ($175)

| | | | |
|---|---|---|---|
| 171.25 | × $105 = | $17,981.25 |
| 16.50 | × $140 = | 2,310.00 |
| 74.25 | × $175 = | 12,993.75 |
| 262 | | $33,285.00 |

1987 ($200)

| | | | |
|---|---|---|---|
| 111.75 | × $120 = | $13,410.00 |
| 7.50 | × $160 = | 1,200.00 |
| 77.75 | × $200 = | 15,550.00 |
| 197 | | $30,160.00 |

Total hours 2810/Lodestar $337,422.50

### MR. PÉREZ BACHS

1976 ($70)

| | | | |
|---|---|---|---|
| 1.25 | × $ 42 = | $52.50 |
| 0 | × $ 56 = | 00.00 |
| 11.75 | × $ 70 = | 822.50 |
| 13 | | $875.00 |

1977 ($80)

| | | | |
|---|---|---|---|
| 6.75 | × $ 48 = | $ 324.00 |
| 2 | × $ 64 = | 128.00 |
| 11.25 | × $ 80 = | 900.00 |
| 20 | | $1,352.00 |

1978 ($90)

| | | | |
|---|---|---|---|
| 8.75 | × $ 54 = | $ 472.50 |
| 32 | × $ 72 = | 2,304.00 |
| 9.25 | × $ 90 = | 832.50 |
| 50 | | $3,609.00 |

1979 ($100)

| | | | |
|---|---|---|---|
| 25.5 | × $ 60 = | $1,530.00 |
| 8.5 | × $ 80 = | 680.00 |
| 24.5 | × $100 = | 2,450.00 |
| 58.5 | | $4,660.00 |

1980 ($110)

| | | | |
|---|---|---|---|
| 20.5 | × $ 66 = | $ 1,353.00 |
| 9.5 | × $ 88 = | 836.00 |
| 71.25 | × $110 = | 7,837.50 |
| 101.25 | | $10,026.50 |

1981 ($125)
40.75 × $ 75 = $3.056.25
7.50 × $100 = 750.00
42.75 × $125 = 5,343.75
91 $9,150.00

1982 ($135)
14.5 × $ 81 = $1,174.50
0 × $108 = 00.00
0 × $135 = 00.00
14.5 $1,174.50

1983 ($140)
5 × $ 84 = $420.00
0 × $112 = 00.00
0 × $140 = 00.00
5 $420.00

1984 ($150)
4 × $ 90 = $360.00
0 × $120 = 00.00
0 × $150 = 00.00
4 $360.00

1985
0 0

1986 ($160)
1.25 × $ 96 = 120.00
27.25 × $128 = 3,488.00
0 × $160 = 00.00
28.50 $3,608.00

Total hours 385.75/Lodestar $35,235.00

## MR. ANDUZE

1979 ($110)
26 × $ 66 = $1,716.00
15 × $ 88 = 1,320.00
0 × $110 = 110.00
41 3,036.00

1980 ($110)
141 × $ 66 = $ 9,306.00
59 × $ 88 = 5,192.00
272.75 × $110 = 30,002.50
472.75 $44,500.50

1981 ($120)
38 × $ 72 = $ 2,736.00
0 × $ 96 = 00.00
137.5 × $120 = 16,500.00
175.5 $19,236.00

1982 ($120)
9.5 × $ 72 = $684.00
0 × $ 96 = 00.00
0 × $120 = 00.00
9.5 $684.00

1983 ($130)
2 × $ 78 = $156.00
0 × $104 = 00.00
0 × $130 = 00.00
2 $156.00

1984 ($130)
7.75 × $ 78 = $ 604.50
0 × $104 = 00.00
7.5 × $130 = 975.00
15.25 $1,579.50

1985 ($140)
39.25 × $ 84 = $3,297.00
0 × $112 = 00.00
8.5 × $140 = 1,190.00
47.75 $4,487.00

1986 ($140)
35.5 × $ 84 = $2,982.00
4.75 × $112 = 532.00
0 × $140 = 00.00
40.25 $3,514.00

1987 ($150)
43.5 × $ 90 = $3,915.00
5.75 × $120 = 690.00
16 × $150 = 2,400.00
65.25 $7,005.00
Total hours 869.25/Lodestar $84,197.50

## MR. FERNÁNDEZ SEÍN

1979 ($110)
157.75 × $ 66 = $10,411.50
129.25 × $ 88 = 11,374.00
6.5 × $110 = 715.00
293.5 $22,500.50

1980 ($110)
435.75 × $ 66 = $28,759.50
145.25 × $ 88 = 12,782.00
414 × $110 = 45,540.00
995 $87,081.50

1981 ($120)
136.5 × $ 72 = $ 9,828.00
14.5 × $ 96 = 1,392.00
168 × $120 = 20,160.00
319 $31,380.00

1982 ($120)
67.25 × $ 72 = $4,842.00
29 × $ 96 = 2,784.00
8 × $120 = 960.00
104.25 $8,586.00

1983 ($130)
39.75 × $ 78 = $ 3,100.50
59.5 × $104 = 6,188.00
90.75 × $130 = 11,797.50
190 $21,086.00

1984 ($130)

| | | | | |
|---|---|---|---|---|
| 107.5 | × | $ 78 | = | $ 8,385.00 |
| 4 | × | $104 | = | 416.00 |
| 12 | × | $130 | = | 1,560.00 |
| 123.5 | | | | $10,361.00 |

1985 ($140)

| | | | | |
|---|---|---|---|---|
| 90.75 | × | $ 84 | = | $ 7,623.00 |
| 14.75 | × | $112 | = | 1,652.00 |
| 26.25 | × | $140 | = | 3,675.00 |
| 131.75 | | | | $12,950.00 |

1986 ($140)

| | | | | |
|---|---|---|---|---|
| 107.25 | × | $ 84 | = | $ 9,009.00 |
| 52.50 | × | $112 | = | 5,880.00 |
| 17.5 | × | $140 | = | 2,450.00 |
| 177.25 | | | | $17,339.00 |

1987 ($150)

| | | | | |
|---|---|---|---|---|
| 76.25 | × | $ 90 | = | $ 6,862.50 |
| 14 | × | $120 | = | 1,680.00 |
| 55.5 | × | $150 | = | 8,325.00 |
| 145.75 | | | | $16,867.50 |

Total hours 2480/Lodestar $228,151.50

### APPENDIX B

This is a breakdown, by categories during 1986 and 1987, *see* n. 4, of the annual fees (without multipliers) we are awarding in Mr. Ramos' favor:

1980–81

404.5 hours × $60 hourly rate = $24,270.

1982–83

15 hours × $80 hourly rate = $1,200.

1984–85

84.5 hours × $100 hourly rate = $8,450.

1986–87 ($120 hourly rate)

75.5 hours in low and medium categories × $90 (75% hourly rate) = $6,795.

3 hours in high category × $120 (full hourly rate) = $360.

Total hours 582.5/Lodestar $41,075.00