Lydia **LIBERTAD**, et al., Plaintiffs,

v.

Carlos **SANCHEZ**, et al., Defendants.

No. CIV. 93–1017(JAF).

United States District Court,
D. Puerto Rico.

Feb. 9, 2001.

222

Judith Berkan, Berkan/Mendez, Hato Rey, PR, Nora Vargas–Acosta, Rio Piedras, PR, Priscilla J. Smith, Simon Heller, Center for Reproductive Law and Policy, New York City, Wanda I. Resto–Torres, PR, Cond. El Centro II Ave. Munoz, Hato Rey, PR, for Lydia Libertad, Grupo Pro Derechos Reproductivos, Rosa, Oficinas Medicas, Mary Rivera, Sociedad Instituto Gineco–Quirurgico, Ana E. Gonzalez–Davila, Rafael Castro, Dr., Ladies Medical Center, plaintiffs.

Frederic Chardon–Dubos, Carolina, PR, for Carlos Sanchez, defendants.

### OPINION AND ORDER

FUSTE, District Judge.

Plaintiffs, Lydia Libertad; Emilia Emancipación, Grupo Pro Derechos Reproductivos (Group for Reproductive Rights); Oficinas Médicas (Medical Offices); Mary Rivera; Sociedad Instituto Gineco–Quirúr-

gico (Gynecological–Surgical Institute); Ana E. González–Dávila; Rafael Castro; and Ladies Medical Center, move for an award of damages and attorneys' fees and costs against Defendant Carlos Sánchez, a member of the anti-abortion rights group Pro–Vida, following entry of a default judgment.

# I.

## *Procedural Synopsis*

On January 8, 1993, Plaintiffs filed this suit against Defendant Sánchez and others,[1] seeking relief from Defendants' blockades and demonstrations at women's health-care facilities in Puerto Rico. Plaintiffs alleged violations of 42 U.S.C. § 1985(3) (1988);[2] the Racketeer Influenced and Corrupt Organizations Acts (RICO), 18 U.S.C. §§ 1961–68 (1994); and the Constitution and tort laws of Puerto Rico. Plaintiffs' Amended Complaint, filed on February 2, 1993, asserted claims for both monetary and injunctive relief.

On February 4–9, 1993, this court held a hearing on Plaintiffs' request for a preliminary injunction. On May 3, 1994, this court granted summary judgment to Defendants on all claims. On April 28, 1995, the First Circuit reversed the ruling of summary judgment in favor of Defendants on all claims, although it upheld the dismissal of the RICO claims against certain Defendants, including Defendant Sánchez.

Since the April 28, 1995 opinion, Defendant Sánchez has failed repeatedly to defend himself or participate in the joint defense. Accordingly, Magistrate Delgado–Colón entered a default judgment against him on June 7, 1996, in which Plaintiffs prevailed against Defendant Sánchez on their section 1985(3) and Puerto Rico tort law claims. Defendant Sánchez has not challenged the default judgment.

On February 6, 1998, the parties, with the exception of Defendant Sánchez, entered into a stipulation agreement. *Docket Document No. 180.* In a subsequent Order, we ordered Defendant Sánchez and his attorney to meet with Plaintiffs' attorneys before February 16, 1998. *Docket Document No. 181.* Defendant Sánchez failed to abide by this order. On February 16, 1998, we entered judgment against all Defendants, except for Defendant Sánchez. *Docket Document No. 182.* Rather, because Defendant Sánchez moved for a final extension of time to plead to the Amended Complaint on February 17, 1998, we granted an extension until March 15, 1998. *Docket Document No. 183.* On April 3, 1998, Defendant Sánchez answered the Complaint.

---

1. For a list of all the defendants, see the Amended Complaint, *Docket Document No. 20.*

2. The statute provides:
 If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
 42 U.S.C. § 1985(3).

On March 31, 1998, Plaintiffs moved for an award of damages, injunctive relief, and attorneys' fees against Sánchez, pursuant to the default judgment. *Docket Document No. 188.*

On May 24, 1999, we enjoined Defendant Sánchez from protesting, demonstrating, picketing, marching, parading or blockading within one-hundred yards of any of Plaintiffs' clinics. We also denied Plaintiffs' motion for damages, costs, and attorneys' fees.

On June 23, 2000, the First Circuit vacated our judgment denying Plaintiffs damages and fees and remanded the case to us with instructions that we either award Plaintiffs damages and fees or explain why such an award is not warranted. On January 12, 2001, we held a Rule 55 hearing to determine the amount of damages to be awarded from Defendant Sánchez to Plaintiffs. FED. R. CIV. P. 55(b)(2). Defendant Sánchez did not appear at this hearing.

## II.

### *Factual Background*

Defendant Sánchez participated in a conspiracy to disrupt and close down medical facilities providing abortions in Puerto Rico. *See Docket Document No. 20.* The conspirators sought to achieve the goals of their conspiracy by intimidating and harassing women who sought abortions and staff members at abortion clinics, by trespassing and impeding exit or entrance of these facilities, and holding disruptive protests.

On September 26, 1992, Defendant Father Patrick Welch led a group of young students in a blockade of the Ladies Medical Center ("LMC"), a health care facility located in San Juan, Puerto Rico. Due to the protest, LMC staff and patients were unable to enter the clinic. On that date, Defendant Welch pushed Plaintiff Ana González Dávila, Administrator of the LMC, across the reception area of the clinic.

Two days later, Defendant Welch brought an eight- or nine-year-old girl into the LMC and refused to leave, even after clinic staff asked him to do so. Defendant Welch harassed and intimidated clinic staff and patients. Afterwards, Defendant Welch blocked the stairway and entrance of the clinic building.

In October 1992, Defendant Welch and several co-conspirators blockaded Women's Medical Pavilion, a medical facility located in Carolina, Puerto Rico.

On or about November 14, 1992, Defendant Welch, along with other co-conspirators, blockaded the entrance to the LMC in violation of a court order prohibiting such conduct. The conspirators defaced the LMC building, causing substantial harm to the property.

In December 1992 and January 1993, the conspirators held demonstrations at LMC almost daily, videotaping persons who entered and exited the clinic.

On December 17, 1992, Defendants Welch and Sánchez, along with other conspirators, blockaded the Women's Metropolitan Clinic in Río Piedras, Puerto Rico, intimidating clinic staff and defacing the clinic. The conspirators prevented others from entering the facility and were subsequently arrested.

On January 8, 1993, Defendants Welch, Sánchez, and others blockaded the entrance to the Clínica Gineco–Quirúrgica y de Planificación Familiar (Gynecological–Surgical and Family Planning Clinic) ("Clínica"), a health care facility in Río Piedras,

Puerto Rico.[3] The conspirators repeatedly protested outside Clínica approximately every other day during January and February 1993. At these protests, the conspirators videotaped persons going into the clinic and the license plate numbers of cars parked near the clinic. They also distributed flyers to discourage women from getting abortions.

## III.

### Analysis

#### A. Default Judgment

■■■ A default judgment is given the same effect as a judgment entered after a trial on the merits. 10 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2684 (2d ed.1983). Following entry of a default judgment, "each of [Plaintiffs'] allegations of fact must be taken as true and each of [Plaintiffs'] claims must be considered established as a matter of law." *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 13 (1st Cir.1985).

#### B. Compensatory Damages

Plaintiffs assert that the damages recoverable under Plaintiffs' Puerto Rico tort claims are also recoverable under section 1985(3). Therefore, Plaintiffs have limited their arguments to the damages available under section 1985(3). We will likewise focus our attention on the damages available to Plaintiffs pursuant to section 1985(3).

■■■ A prevailing section 1985 plaintiff is entitled to compensatory damages. *See* 42 U.S.C. § 1985(3) ("[T]he party so injured or deprived may have an action for the recovery of damages, occasioned by

such injury or deprivation, against any one or more of the conspirators."); *Carey v. Piphus*, 435 U.S. 247, 255–56, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Plaintiffs are entitled to recover compensation for actual injury suffered as a result of Defendants' actions. "[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'" *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (internal citations omitted). As a member of the conspiracy, Defendant Sánchez may be held accountable for the actions of the other conspirators in the furtherance of the conspiracy. *See Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980) ("[C]onspiracy is ... the mechanism by which ... to impose liability on one defendant for the acts of the others performed in pursuance of the conspiracy."); *Hobson v. Brennan*, 646 F.Supp. 884, 888 (D.D.C. 1986) (finding that FBI agents were jointly and severally liable pursuant to section 1985(3) for violating protesters' civil rights).

Plaintiffs seek compensation for the following injuries: (1) emotional and physical injury to LMC and Clínica patients who were unable to obtain timely medical care due to Defendants' activities; (2) emotional and physical injury to the owners and staff of LMC and Clínica; (3) economic injury to LMC and Clínica resulting from property damage, lost income, and the need to adopt additional security measures and obtain legal protection against Defendants; and (4) emotional, physical and economic injury to members of Plaintiff Grupo Pro

---

**3.** Clínica is owned and operated by Plaintiff Sociedad Instituto Gineco–Quirúrgico ("Sociedad Instituto").

Derechos Reproductivos ("Grupo") who took measures to defend abortion clinics from the conspirators.

### 1. *Emotional and Physical Injury to Patients*

██ A woman who is unable to keep her appointment for an abortion because of a blockade suffers tremendous physical and emotional harm. *N.Y. State Nat'l Org. for Women v. Terry,* 704 F.Supp. 1247, 1262 (S.D.N.Y.1989). A needless delay in terminating a pregnancy imposes a substantial burden on a woman seeking an abortion.

At the Rule 55 hearing, Plaintiffs presented uncontradicted expert testimony from Stanley Henshaw, a sociologist specializing in reproductive epidemiology. According to Henshaw, a blockade of an abortion clinic results in numerous harms to women seeking abortions. Some women might decide not to terminate their pregnancies at all. Other women who are unable to receive an abortion on a particular day due to a blockade but do terminate their pregnancies at a later date experience increased anxiety, distress, and depression. Some patients experience severe symptoms from the pregnancy itself. Women suffer an increased risk of complications and mortality resulting from the abortion procedure for every week that the pregnancy progresses. Anti-abortion blockades also increase patients' concerns about keeping their abortions confidential.

Most of LMC's patients come from small towns around Puerto Rico and the neighboring islands of Vieques and Culebra. A substantial number come from the United States Virgin Islands of St. Croix and St. Thomas. LMC has also treated patients from the Dominican Republic.[4] Some of the patients that were treated at Clínica also came from outside the San Juan metropolitan area and had to come into the clinic from the interior of the island. To terminate their pregnancies, many of the women had to make arrangements to miss work and/or obtain child care. The blockades and demonstrations by the conspirators hindered the patients' plans to terminate their pregnancies. The women who were unable to obtain timely medical care due to Defendants' activities are entitled to compensation for their injuries.

In most of the cases brought against anti-abortion activists pursuant to section 1985(3), courts have handed down injunctive relief and contempt fines for violating injunctions. *See, e.g., N.Y. State Nat'l Org. for Women v. Terry,* 159 F.3d 86, 89 (2d Cir.1998); *Nat'l Org. for Women v. Operation Rescue,* 37 F.3d 646, 648–49 (D.C.Cir.1994); *Roe v. Operation Rescue,* 919 F.2d 857, 860 (3d Cir.1990). Plaintiffs have not cited, and we have not found, any cases in which patients were awarded compensatory damages for emotional and physical injury caused by anti-abortion activists. Consequently, we turn to cases brought under other statutes in which women were awarded compensatory damages for suffering abortion-related discrimination. The First Circuit has relied on Title VII law to fill in the interstices of case law under other statutes. For example, in *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 843 (1st Cir.1993), the First Circuit extended a rule applied in cases brought under Title VII to a lawsuit arising under the Age Discrimination in Employment Act.

In *Turic v. Holland Hospitality, Inc.,* 849 F.Supp. 544, 557 (W.D.Mich.1994), *rev'd on other grounds,* 85 F.3d 1211 (6th Cir.1996), the court awarded a Title VII

---

4. The record is unclear as to whether these patients came to Puerto Rico specifically to seek an abortion, or if they reside in Puerto Rico.

plaintiff $50,000 in compensatory damages for abortion-related discrimination. The court held that the plaintiff had been terminated from her employment because she was pregnant and had been contemplating an abortion. *Id.* at 553. The court found that such an award was appropriate because the plaintiff "suffered significant and unusual emotional pain, suffering, and mental anguish in response to defendant's actions." *Id.* at 557. The court found that Turic was entitled to compensatory damages because of the suffering caused by her employer's discrimination against her because she had been considering an abortion.[5] The Sixth Circuit later affirmed the district court's award of $50,000 in compensatory damages. *Turic,* 85 F.3d at 1216.

Lydia Libertad and Emilia Emancipación are fictitious names for two Plaintiffs who tried to terminate their pregnancies at women's medical facilities that are also Plaintiffs in this lawsuit. Libertad and Emancipación sought abortions prior to the initiation of this action. In their Amended Complaint, Plaintiffs alleged that Libertad and Emancipación suffered extreme medical and physical distress due to the blockades carried out by Defendant Sánchez and the other members of the conspiracy. *Docket Document No. 20.* During the February 4–9, 1993 preliminary injunction hearing, Emancipación testified that she terminated her pregnancy at the LMC in 1992 after her contraceptive method had failed. After the abortion, she was unable to receive timely follow-up care because the LMC was being blockaded by Defendants.

This court accepts the allegations of the complaint as true, as we must, and we also consider Emancipación's testimony at the 1993 hearing. Consequently, we find that Plaintiffs Libertad and Emancipación are each entitled to $50,000 to compensate them for the extreme emotional and physical distress they suffered due to Defendants' conspiratorial activities. We have carefully considered the repetitive, destructive, and militant nature of the demonstrations by the conspirators, as well as the importance of a pregnant woman's fundamental right to be able to obtain an abortion. *See Planned Parenthood v. Casey,* 505 U.S. 833, 933, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Blackmun, J., concurring in part and dissenting in part) (internal citation omitted).

2. *Emotional and Physical Injury to the Owners and Staff of LMC and Clínica*

At the Rule 55 hearing, Plaintiff González, Administrator of the LMC, testified that the experience of being pushed and harassed by Defendant Father Welch on September 26, 1992, was distressing, and the episode still upset her over eight years later. The conspirators' activities exacerbated González' asthma, and she spent three weeks at the hospital. The LMC staff were frightened as a result of the conspirators' protests, and some of them quit because of the pressure and fear. Plaintiff Rivera, Administrator of Clínica, testified that Defendants' illegal blockades caused her to become scared and anxious. Clínica staff were seriously affected by the Defendants' demonstrations, and they were terrified.

Prior to the anti-abortion demonstrations, LMC had a lease to rent the space in their building, and the contract was renew-

---

**5.** The court stated: "The suffering caused by this termination was exaggerated not by the fact plaintiff was undergoing a personal crisis at the time, but because the very reason plaintiff was fired was that she was confronting a decision about an unplanned pregnancy." 849 F.Supp. at 558.

able every four or five years. Because of complaints from other businesses in the building about the disruption caused by Defendants, LMC's lease was not renewed, and the clinic now leases the space on a month-to-month basis. Plaintiff González testified that her loss of a lease to rent the clinic facilities caused her to feel insecure about the future of her business.

We find that Plaintiff González is entitled to $5,000 and Plaintiff Rivera is entitled to $1,000 for their emotional and physical injuries caused by Defendants.

### 3. Economic Injury to LMC and Clínica

■ Plaintiffs LMC and Clínica may recover compensatory damages for economic injuries suffered by them as a result of Defendants' anti-abortion activities. *See, e.g., Roe v. Operation Rescue*, 919 F.2d 857, 863 (3d Cir.1990) (awarding $2308 in payroll costs to abortion clinics).

### a. LMC

At the January 12, 2001 hearing, Plaintiff González testified that the following damages resulted from Defendants' September 26, 1992 blockade: $180 for replacement of broken locks; $150 for removal of stickers of fetuses; and $300 for replacement of a sign that had been covered with a large photograph of a dismembered fetus. In addition, LMC was unable to serve ten to twelve patients who had appointments to terminate their pregnan-

cies, as well as follow-up patients.[6] At the time, LMC was charging $225 to terminate pregnancies of up to ten weeks, and $300 to terminate pregnancies of over ten weeks. LMC lost approximately $2,888 in income due to the blockade.[7] We find that LMC suffered $3,518 in economic damages due to the September 26, 1992 blockade.

On September 28, 1992, Defendant Welch brought a female child into the LMC and remained there, intimidating patients. The child appeared to be fearful of Defendant Welch and urinated on the clinic sofa, which cost $300 to replace. In addition, LMC lost at least two patients due to Defendant Welch's protest. Hence, we find that LMC suffered $825 in damages due to Father Welch's protest on September 28, 1992.

On November 14, 1992, Defendants engaged in another blockade of LMC. The facility incurred costs of $150 to remove stickers attached by protesters onto clinic facilities, and $400 to replace an electric lock on the rear gate. LMC lost approximately the same amount of income on November 14 as on September 26: $2,888. Total damages resulting from the November 14, 1992 blockade were $3,438.

Due to the conspirators' activities, LMC hired a private security guard to protect the property from November 1992 to February 1993. The guard was paid $336/week, over a four-month period, resulting in a total cost of approximately $5,376.[8]

---

6. At the January 12, 2001 hearing, González testified that LMC had appointments for twenty-two abortions on September 26, 1992, and the clinic had been expecting walk-in clients. In the preliminary injunction hearing in February 1993, González testified that LMC had about ten to twelve appointments scheduled on September 26, 1992. We credit the 1993 testimony, which was given while the events were fresh in the witness' mind.

7. Whenever a range of numbers has been offered to the court, we have used averages in computing damages.

8. On January 12, 2001, González testified that the guard was hired for a six-month period, beginning in September 1992. In February 1993, González testified that the guard had been retained only after the large blockade in November 1992. We credit her 1993 testimony, since that hearing was much closer to the events in question and her testimony had not

LMC paid its attorney $600 to obtain a protective order against Defendants. Subsequent legal work resulted in a grand total of $3,000 in legal fees incurred by LMC.

In addition to these costs, LMC suffered a substantial decline in the number of patients treated at the facility. Prior to Defendants' protest activity, LMC had treated approximately eighty patients per week. Due to the conspirators' demonstrations and blockades, LMC's average weekly patient intake was reduced to only about fifteen patients. Assuming that LMC lost sixty-five patients per week during the period of the most intense activity from late September 1992 through January 1993, and each of those patients would have paid $225–300 to terminate her pregnancy there, the clinic lost $290,063 in income due to the conspiracy.

### b. *Clínica*

The January 8, 1993 blockade of Clínica resulted in substantial costs for the clinic. Clínica incurred the following costs to repair damage done by protesters: $325 to repair an electric gate; $225 to change locks; $387 for paint; $1,852 to repair broken glass; $1,000 in cleaning and painting costs; and $3,850 to replace damaged air conditioning units on the roof. Thus, the total cost for the repairs was $7,639.

Due to Defendants' blockades, Clínica was unable to see any patients on January 8, 1993, as well as on February 27, 1993. Clínica lost $2,400 in income on each of those days.[9]

Clínica also experienced a protracted decline in patient intake due to the conspirators' protest activities. Due to De-

fendants' illegal activities, weekly patient intake declined to half or less of the usual amount. The decline in clinic business lasted for six months, and was serious for two or three months. Clínica operated six days a week, from Mondays through Saturdays. Assuming that Clínica lost half of its usual $2,400 daily income over a two-month period, the clinic lost $52,800 due to Defendants' activities.[10]

### c. *Emotional, Physical, and Economic Injury to Members of Plaintiff Grupo*

█ Grupo is an association of feminist and human rights organizations and individuals. The association sues on behalf of itself and its members. The association has devoted considerable time and energy to protecting women who seek abortions at family planning clinics against anti-abortion activists. At the Rule 55 hearing, Ruth A. Arroyo Muñoz, a founding member of Grupo, testified that she was involved with weekly demonstrations from late 1992 until July 1996. There were twenty organizers, including Arroyo Muñoz, who spent fifteen to twenty hours per week coordinating counter-protests. When Defendants blockaded an abortion clinic, Grupo members would organize their own demonstration in support of a woman's right to terminate her pregnancy. Grupo members experienced tension, fear, indignation, and anger at these demonstrations. Some of them developed stomachaches, headaches, and insomnia, and these effects intensified over time. We find that members of Plaintiff Grupo are entitled to a total of $1,000 to compensate them for their injuries.

---

been given for the specific purpose of assessing damages.

**9.** The $2,400 figure is taken from Plaintiff Rivera's affidavit, *Docket Document No. 189.*

**10.** This figure does not include income lost on January 8, 1993, and February 27, 1993, since these losses have been considered above.

### 4. Federal Rule of Civil Procedure 54(c)

In their Amended Complaint, Plaintiffs sought compensatory damages of $250,000. *Docket Document No. 20.* Federal Rule of Civil Procedure 54(c) provides: "A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." FED. R. CIV. P. 54(c). *See Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 683 (2d Cir.1993); *In re Dierschke,* 975 F.2d 181, 185 (5th Cir.1992) ("Rule 54(c), and for that matter fundamental fairness, dictate that a judgment by default operates as a deemed admission only as to the relief requested in the complaint."). Since the actual damages resulting from Defendants' conspiracy, $478,459, greatly exceeds the amount of damages requested in the complaint, we proportionally reduce Plaintiffs' awards to reach a total of $250,000.

| Plaintiff | Damages | Award |
|---|---|---|
| Lydia Libertad | $ 50,000 | $ 26,125 |
| Emilia Emancipación | $ 50,000 | $ 26,125 |
| Ana González–Davila | $ 5,000 | $ 2,613 |
| Mary Rivera | $ 1,000 | $ 523 |
| LMC | $306,220 | $160,003 |
| Clínica ("Sociedad Instituto") | $ 65,239 | $ 34,088 |
| Grupo | $ 1,000 | $ 523 |
| TOTAL | $478,459 | $250,000 |

### C. Punitive Damages

Courts may award punitive damages for violation of section 1985. *See Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (finding that punitive damages are available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"); *Irizarry v. Quiros,* 722 F.2d 869, 872 (1st Cir.1983).

Plaintiffs seek $1,000,000 in punitive damages against Defendant Sánchez. Plaintiffs have pleaded, and this court accepts as true, that Defendant Sánchez, along with his co-conspirators, "are motivated by hostility towards women and their progress in society and towards their exercise of equal rights and access to equal services, including medical and reproductive services." *Docket Document No. 20.* Consequently, we find that Defendants' malicious intent to prevent the achievement of gender equality merits an award of $100,000 in punitive damages.

### D. Attorneys' Fees and Costs

Pursuant to 42 U.S.C. § 1988(b) (1988 & Supp. I.2000), this court may award attorney's fees to Plaintiffs.[11] Where a party prevails in a civil rights action, attorneys' fees are generally granted unless such an outcome would be unjust. *de Jesus v. Banco Popular de P.R.,* 918 F.2d 232, 234 (1st Cir.1990). We find no unjustness in awarding fees in this case, where the default judgment represented a successful outcome for Plaintiffs.

The starting point in determining the proper amount of an attorney's fee award is to multiply the number of hours reasonably required to litigate the case by a reasonable hourly rate to arrive at a "lodestar" figure. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). To calculate the number of hours reasonably required to litigate the action, we first examine the number of hours spent by the attorneys and subtract any hours which were unnecessary or excessive. *See Wojtkowski v. Cade,* 725 F.2d 127, 130 (1st Cir.1984). In determining a reasonable

---

11. The statute provides in part: "In any action or proceeding to enforce a provision of section[ ] ... 1985 ... of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...." 42 U.S.C. § 1988(b).

hourly rate, courts should consider "the type of work performed, who performed it, the expertise that it required, and when it was undertaken." *Grendel's Den,* 749 F.2d at 950–51. When awarding attorney's fees, we are required to scrutinize carefully the hourly fee sought by the attorney and the amount of time spent. *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977).

Plaintiffs have requested fees for the services of nine attorneys: Bonnie Scott Jones, Viviana Waisman, Priscilla Smith, Judith Berkán, Wanda Resto–Torres, Catherine Albisa, Peter Berkowitz, Nora Vargas Acosta, and Simon Heller. *Docket Document Nos. 188, 205.*

 When applying for attorneys' fees, attorneys are required to keep detailed, contemporaneous-to-the-activity time records. *Grendel's Den,* 749 F.2d at 952. If a lawyer has not kept contemporaneous time records, courts will substantially reduce or even disallow an award of fees, except in extraordinary circumstances. *Id.* Plaintiffs' attorneys have supplied the court with a comprehensive list of hours spent on the litigation, by date. Most tasks have been described in adequate detail. Most of the attorneys, with the exceptions of Catherine Albisa and Peter Berkowitz, have submitted sworn affidavits confirming that the documents submitted to this court are a summary of hours taken from contemporaneous records. We have highlighted any problems with the attorneys' records in our discussion.

### 1. *Bonnie Scott Jones*

 Jones, a staff attorney at the Center for Reproductive Law & Policy (CRLP), submitted two affidavits in support of Plaintiffs' request for fees. *Docket Document Nos. 188, 205.* In Plaintiffs' first motion for award of relief against Defendant Sánchez, Jones sought fees for 35.50 hours of work done in 1998, at a rate of $150 per hour, for a total of $5,325. Subsequent to the filing of the first award motion, Jones spent another 132 hours on this case from September 1999 to January 2001.

We find that Jones has provided a sufficiently-detailed accounting of the time she spent on this case to merit compensation for .167.5 hours. Jones' declarations list the number of hours spent, broken down into quarter-hour increments, on specific days, along with the particular task completed during that time. These summaries are based on contemporaneous time records.

 The problem lies in the lack of external information about the reasonable market rate for Jones' services. The plaintiff has the burden of establishing the prevailing market rate for comparable legal services. *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). A party seeking attorneys' fees is required to present evidence other than the attorney's own affidavits regarding the prevailing hourly rate. *Bordanaro v. McLeod,* 871 F.2d 1151, 1168 (1st Cir. 1989). It is unfortunate that most of Plaintiffs' attorneys have not done so.

According to her affidavit, Jones derived her requested $150 hourly rate by considering hourly rates billed by private attorneys in Puerto Rico with comparable specialized experience, the hourly rates of the other attorneys seeking fees in this case, and fees awarded by courts to other public-interest attorneys in similar cases. She has neither provided the court with information on the comparable local hourly rates she used to derive her requested rate, nor has she cited to other cases in which public interest attorneys were awarded similar fees. Nevertheless, this

court must determine a reasonable rate for her services.

Jones graduated from Yale Law School in 1993. She clerked for a United States District Judge and the Massachusetts Superior Court before joining the CLRP in 1996. Given Jones' specialization in reproductive rights litigation, we find that CRLP should be compensated at the reasonable rate of $130 per hour. This rate, multiplied by the number of hours worked by Jones, results in a total of $21,775 for Jones' fees.

## 2. *Viviana Waisman*

■ Waisman, a fellowship attorney at CRLP, has submitted a summary of her time spent on this case based on contemporaneous time records. *Docket Document No. 188.*

Waisman graduated from the University of California, Hastings College of the Law, in 1995. She was a litigation associate in a large law firm during her first year out of law school, and then she became a consultant in the international department at CRLP. In January 1998, Waisman became a fellowship attorney at CRLP. Waisman spent thirty hours on this case and is seeking an hourly rate of $125, resulting in a total fee of $3,750.

We find that Waisman has satisfactorily accounted for her time spent on the case to warrant compensation for thirty hours of her services. Waisman has not provided any evidence outside of her own affidavit as to whether a $125 hourly rate is reasonable. Since Waisman is the least experienced attorney out of the nine Plaintiffs' attorneys seeking compensation, we find that CRLP should be compensated at an hourly rate of $80 for Waisman's work. We, therefore, award Plaintiffs $2,400 for Waisman's services.

## 3. *Priscilla Smith*

Smith, a staff attorney at CRLP, spent 13.9 hours working on this litigation. We find that Smith has provided sufficient documentation to justify an award of fees for her 13.9 hours of work on this case.

Smith graduated from Yale Law School in 1991. She joined a large law firm after graduation, before becoming a fellowship attorney with CRLP in 1993. Smith became a staff attorney at CRLP when her fellowship ended in 1995. Smith has participated in other cases involving reproductive rights, and is seeking an hourly rate of $150. She bases her request on the hourly rates charged by private attorneys in Puerto Rico who have similar experience, the rates requested by her co-counsel in this case, and court-awarded fees to lawyers who have participated in similar litigation.

We find that a $130 hourly rate is a reasonable rate for Smith's services. *Cf. Morales Feliciano v. Hernández Colón,* 697 F.Supp. 51, 59 (D.P.R.1988). We therefore award CRLP $1,807 for her services in this case.

## 4. *Judith Berkan*

■ Berkan, a sole practitioner in San Juan, Puerto Rico, has been practicing law since graduating from Harvard Law School in 1974. Berkan has been a law professor since 1978, and she has published many articles on civil rights issues. Berkan has been lead counsel in numerous civil rights cases. Based on contemporaneous time records, Plaintiffs seek fees for 218.9 out-of-court hours and 31.2 in-court hours of Berkan's work.

Berkan has submitted detailed summaries of time spent on this case over several years: 18 hours of out-of-court time in 1992; 162.5 hours of out-of-court time and 21.9 hours of in-court time in 1993; 17.4

hours of out-of-court time and 1 hour of in-court time in 1994; 3.4 out-of-court hours in 1995; 4.2 out-of-court hours and 1.5 in-court hours in 1996; 7.9 out-of-court hours and 2.8 in-court hours in 1997; and 5.5 out-of-court hours and 4.0 in-court hours in 1998. Given the level of detail in her declaration, we find that Plaintiffs are entitled to compensation for the total time Berkan spent on the case, 218.9 hours out of court, and 31.2 hours in court.

Berkan requests a $260 hourly rate for in-court time, and a $230 hourly rate for out-of-court time. Berkan submits that attorneys in large law firms with similar levels of experience in other areas of the law charge up to $275 per hour in Puerto Rico. We also consider the level of fees that have been awarded by the courts to Berkan in previous cases.

In 1991, in *Lipsett v. Univ. of P.R.,* Berkan was awarded $200 per hour of in-court work, and $175 per hour out of court. In 1994, we awarded Berkan $215 per hour in court, and $190 per hour of out-of-court work in *Kerr v. American Airlines.* In *Rodríguez v. Miranda,* Berkan was awarded $225 per hour of in-court work and $200 per hour of out-of-court work in a case involving work carried out between 1992 and 1996. In *Campos v. Rivera,* Berkan was awarded $250 per hour in court and $225 per hour of out-of-court work in a case that involved work undertaken between 1995 and 1997.

Based on previous awards of fees to Berkan, we think an equitable outcome will be to grant Berkan rates of $215 for in-court work and $190 for out-of-court work performed from 1992 to 1994, and rates of $250 for in-court time and $225 for out-of-court work undertaken between 1995 and 1997. We award Berkan $255 per hour of in-court time and $230 per hour of out-of-court time for work undertaken in 1998. *Cf. Morales Feliciano,* 697 F.Supp. at 58

(granting a $10 per hour increase for every two years of experience gained by a seasoned attorney). In sum, we award a total of $49,372 for Berkan's services in this litigation.

### 5. *Wanda Resto–Torres*

 Resto–Torres, a sole practitioner, spent seventy-four hours working on this case in 1993. Resto–Torres has submitted a summary of the time spent on this litigation, based on contemporaneous records. Attorneys seeking court-ordered fees are obligated to keep detailed records so that the court can evaluate whether the time spent working on the case was indeed reasonable. We find that some of the hours claimed by Resto–Torres to be an unreasonable expenditure of time.

For example, on January 8, 1993, Resto–Torres spent two hours working on this litigation, during which she "went to Federal Court for status of case." Resto–Torres does not specify the exact reason for her trip to the courthouse. Since her address is in Takoma Park, Maryland, it is unclear whether she went to the federal courthouse in Maryland or the federal court in Puerto Rico, where this case was filed. There is no indication in the record that she had traveled to Puerto Rico during that time. Moreover, this work may have been clerical in nature, and therefore would not require an attorney's specialized skills. *See Gonzalez v. P.R. Dep't of Educ.,* 1 F.Supp.2d 111, 116 (D.P.R.1998) (awarding attorneys' fees in Individuals with Disabilities Education Act case).

On February 5, 1993, Resto–Torres spent two hours during which she "[r]eviewed development of case." This court will not award fees for time spent on a case if the attorney cannot specify exactly what task was performed during those hours.

Consequently, we reduce the number of compensable hours worked by Resto–Torres from seventy-four to seventy hours.

Resto–Torres requests an hourly rate of $80. Resto–Torres graduated from the University of Puerto Rico Law School in 1985. She specializes in gender discrimination, family law, and civil law.

We find that an $80 hourly rate is a reasonable rate for Resto–Torres' services. We award her $5,600 in legal fees.

### 6. Catherine Albisa

Albisa is a staff attorney and adjunct professor at the International Women's Human Rights Law Clinic at City University of New York. Albisa was Plaintiffs' lead attorney on appeal and for motion practice at the trial court level.

Albisa submits that she worked at least 205.75 hours on this case. Albisa was formerly employed with CRLP. Since her departure from CRLP, her files have been moved, archived, and some have been misplaced. Consequently, Albisa's summary of her work is not based on contemporaneous time records, but was reconstructed based on notes in her appointment book, the contemporaneous time records of her assistant, the calendar of filings and court appearances in this case, and her memory of her involvement in the case.

Albisa has submitted an account of 205.75 hours spent by her on this litigation in 1994. Since she has reconstructed her record using other sources, we reduce the award of fees for her services. *Grendel's Den*, 749 F.2d at 952. We reduce Albisa's claimed number of hours worked by one-half, to 102.9 hours.

Albisa requests $160 per hour worked on this case. She has not submitted external evidence indicating whether this rate is reasonable. Albisa received her J.D. from Columbia University School of Law in 1989 and then clerked for a federal judge. She became a staff attorney at the Reproductive Freedom Project of the American Civil Liberties Union, where she was lead counsel or co-counsel in several cases involving reproductive rights. We find that Albisa's experience and expertise warrant a $130 hourly rate for her services. Consequently, we award Albisa $13,377 for her contribution to this litigation.

### 7. Peter Berkowitz

Berkowitz, a sole practitioner in San Juan, Puerto Rico, claims to have spent 103 hours working on this litigation. Berkowitz was unable to find his original time records and based his request for fees by relying on his memory, consulting with co-counsel, and referring to co-counsels' time records.

Berkowitz has not proffered any explanation as to why an experienced attorney like himself has not maintained accurate, contemporaneous time records as required by U.S. Supreme Court and First Circuit case law. *See Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Bordanaro v. McLeod*, 871 F.2d 1151, 1168 (1st Cir.1989). We are concerned about the accuracy of the hours he claims to have worked on this litigation, particularly because his affidavit was signed in 1998, several years after he worked on this case in 1992 and 1993. Consequently, we reduce the number of compensable hours by three-quarters, to 25.75 hours. *See Grendel's Den*, 749 F.2d at 952. We award Plaintiffs compensation for 25.75 hours worked by Berkowitz.

Berkowitz seeks an hourly rate of $250. He has been practicing law since 1972. Berkowitz specializes in civil rights litigation and criminal defense work in the federal courts, and he has been lead coun-

sel on several major civil rights cases. In 1990, Berkowitz was awarded fees of $175 per hour, plus a 2.5 multiplier, for his work in the Dupont Plaza Fire Litigation. We find that $190 is a reasonable hourly rate for Berkowitz' work, almost all of which was performed in 1993. Thus, we award him $4,893 in compensation.

### 8. *Nora Vargas Acosta*

■ Vargas Acosta, a sole practitioner based in Río Piedras, Puerto Rico, spent 80.5 hours working on this litigation in 1992 and 1993. We find that Vargas Acosta is entitled to compensation for 78.5 hours of work, excluding two hours in which she "review[ed] development of case."

Vargas Acosta seeks an hourly rate of $150. Vargas Acosta received her J.D. from the Interamerican University Law School in 1983. She has fifteen years of experience in civil rights litigation and is an adjunct professor of civil rights litigation at the University of Puerto Rico School of Law.

Based on this court's award of fees to attorneys with similar experience in *Kerr v. Am. Airlines, Inc.*, No. CIV. 92–2890, 1994 WL 528068, at *5 (D.P.R. Aug. 22, 1994), we find that an hourly rate of $125 for Vargas Acosta's work to be reasonable. Thus, we award Vargas Acosta $9,813 in attorneys' fees.

### 9. *Simon Heller*

■ Heller, Director of the Domestic Program at CRLP, graduated from Yale Law School in 1986 and has specialized in reproductive rights litigation since 1989. In *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691 (1996), the Ninth Circuit awarded Heller an hourly rate of $250 for work performed in 1995. Heller seeks a $250 hourly rate for the 5.5 hours he spent on this case in 2001.

*Guam Soc'y* involved a successful challenge to Guam's anti-abortion statute. The district court apparently used New York as the relevant community for determining the prevailing market rate, since CRLP is located in New York City. *Id.* at 702. The court relied on affidavits from attorneys working for two prestigious New York law firms, as well as affidavits from the plaintiffs' attorneys outlining their experience. *Id.*

■ An out-of-town legal specialist may be compensated at the usual rate he charges in his own city if there are no local attorneys who have the particular expertise of the specialist. *Maceira v. Pagan*, 698 F.2d 38, 40 (1st Cir.1983). If an outside lawyer is retained to perform work that could be done by local attorneys with comparable experience, the attorney is to be compensated at the local rate. *Id.* Although Heller is based in New York, he will be compensated at Puerto Rico rates for his services. This was not a situation where there were no competent local counsel willing and able to litigate this case; some of Plaintiffs' attorneys, including Berkan, Berkowitz, and Vargas Acosta, are based in Puerto Rico. Moreover, Jones and Smith based their requested hourly rates on rates charged by private attorneys in Puerto Rico, not New York. Given Heller's experience in reproductive rights litigation, we find that a $150 hourly rate is reasonable compensation 'for his time. The $150 rate, multiplied by Heller's 5.5 hours of work, results in an award of $825 for Heller's services.

### 10. *Costs*

■ Pursuant to section 1988, courts may award to successful plaintiffs out-of-pocket expenses that would normally be billed to a fee-paying client. *See Boston & Maine Corp. v. Moore*, 776 F.2d 2, 11 (1st

Cir.1985). Recoverable expenses include: Travel, photocopies, lodging, postage, telephone calls, and computerized research. *Ramos Padro v. Commonwealth of P.R.,* 100 F.Supp.2d 99, 108 (D.P.R.2000). Plaintiffs seek $11,641 in attorneys' costs. This sum was spent on travel, meals, lodging, filing fees, translations, depositions, postage, messenger services, and local transportation. We award Plaintiffs $11,641 in costs.

## IV.

### *Conclusion*

In accordance with the foregoing, we award Plaintiffs the following sums: $250,000.00 in compensatory damages; $100,000.00 in punitive damages; $109,862.00 in attorneys' fees, and $11,641.00 in costs.

**IT IS SO ORDERED.**